**Wayne and Judy ACTON, guardians ad litem for James Acton, Plaintiffs,**

v.

**VERNONIA SCHOOL DISTRICT 47J, Defendant.**

**Civ. No. 91–1154–MA.**

United States District Court, D. Oregon.

May 7, 1992.

Thomas M. Christ, Mitchell, Lang & Smith, Portland, Or., for plaintiffs.

A. Gregory Powell, Chris L. Mullmann, Davis Wright Tremaine, Portland, Or., for defendant.

## OPINION

MARSH, Judge.

Plaintiffs filed this action for declaratory and injunctive relief claiming that the Vernonia School District's drug testing policy violates their son's rights under the Fourth Amendment of the United States Constitution and Article 1, Section 9 of the Oregon Constitution. The following constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## FACTS

### I. *Background*

Vernonia, Oregon, is a small logging community of approximately 3000 persons including all those living within or near the city limits. Plaintiffs Wayne and Judy Acton reside in Vernonia and their son James, age 12, is enrolled in the seventh grade of Washington Grade School. Due to its small size and somewhat remote location, Vernonia is typified by its central interest in school district activities in general and athletics in particular. Witnesses explained that the entertainment opportunities in Vernonia are fairly limited so that interscholastic athletics play a dominant role in the community and student athletes are well known and admired. Approximately 60–65% of the high school students and 75% of the elementary school students participate in district sponsored athletics.

The school district employs a small but stable and closely knit teaching staff with deep ties to the community. For instance, two of the teachers who testified at trial grew up and attended school in Vernonia. Randall Aultman, the current principal of Washington Grade School, has a long tenure with the district and has held the positions of Assistant Superintendent and principal of the high school. Other teachers who testified had years of experience in the district, and I was impressed by their knowledge and concern for the community, its students and school system.

Aultman and the teachers testified that, up until the early 1980s, discipline at the Vernonia schools was not a problem. The teachers were well acquainted with the students and their families and students were generally cooperative and respectful both in the classrooms and during after-school activities. Drug and alcohol use, although present, was limited to certain small "fringe" elements of the student population. Then, in the mid-to-late 1980s, the staff began noticing a startling and progressive increase in students' use of drugs and alcohol. As the administration became more aware of the problem, it began investigating its possible source. Aultman met with the teaching staff and asked them to look for any signs of drug or alcohol use to gauge the magnitude of the problem and to try to determine what responsive steps should be taken.

In the meantime the glamorization and use of drugs and alcohol became more blatant. All of the teachers who testified at trial expressed how appalled and helpless they felt as students increasingly expressed their attraction to, and vocal defense of, the use of drugs. Students boasted about drug use and regaled one another with stories of the latest "high" or "party". Class decorum suffered. One teacher, who had never experienced classroom discipline problems in the past, was ready to give up 15 years of service because of her frustration and apparent inability to deal with this new situation. Outbursts of profane language during class, rude and obscene statements directed at other students, and a general flagrant attitude that there was nothing the school could do about their conduct or their use of drugs or alcohol typified a usual day. Organizations formed within the student drug culture taking such names as the "Big Elks" or the "Drug Cartel." Loud "bugling" or "head butting" were the calling cards of these groups. Drug paraphernalia was confiscated on schools grounds, and open use of

drugs was observed at a local cafe across the street from the high school.

Drug and alcohol use also invaded the sports program. Students consumed alcohol on a bus after a game. Others stole alcohol from a store after a track meet. Ron Svenson, a teacher and wrestling coach, testified that suspected drug use contributed to the injury of a wrestler who failed to execute a basic maneuver. When visiting the hotel room of the student the next day the smell of marijuana permeated the area. Svenson also gave convincing testimony that drug use affected certain football players in that they ignored or forgot well-drilled safety routines. He also expressed a concern that the use of intoxicants would slow down their reaction time and hence, make them more susceptible to injury. Svenson's concerns were corroborated by the testimony of Dr. DuPont, who explained the deleterious effects of drugs and alcohol on a person's motivation, memory, judgment, reaction, coordination and performance.

Svenson also explained that a student injured in a regular physical education class is much more apt to disclose an injury than one engaged in interscholastic activity, given the highly competitive atmosphere of the latter. This sense of pride and desire to stay in the game, when coupled with the numbing influence of drugs, became a significant concern to all involved in the athletic program.

School officials had a clear perception that the discipline problems they were experiencing were the result of substance abuse. Informal interviews with responsible students and parents confirmed that fact. Based upon the administration's investigation, it also became clear that the leaders of this activity were also the leading student athletes. Thus, the very center of activity of the school and the community was endangered. Further, the administration was concerned that the corruption of the school's leading athletes might have a significant poisoning impact upon the broader student population, including the younger and more impressionable elementary school students who would eventually seek to emulate their elders. No evidence was presented that refuted any of the facts set forth nor the conclusions reached by the school officials.

Following its initial investigation, the school administration attempted to address this problem and deter drug and alcohol use through education. Special classes were held on the effect and addictive nature of drugs. Special speakers were invited who the school hoped would have a particular charm with the students. Seminars within classes, polls, and theatrical presentations were all tested and failed to achieve any significant impact on the disruptive atmosphere. The day after the presentation of a play directed at the evils of drug use, several sophomore athletes were caught cutting classes to hold a party where arrests took place for the use of intoxicants. The administration even brought in a specially trained dog to sniff for drugs in locker area, but none of these efforts deterred the students. As Dr. DuPont confirmed, youth who use drugs are typically in denial and think they can control their drug use. Thus, simply telling them that drug use is bad for their health and that they should stop using is invariably ineffective. DuPont testified that what youth really need is a compelling reason or incentive to stop using drugs.

The evidence amply demonstrated that the administration was at its wits end and that a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion. Disciplinary actions had reached "epidemic proportions." The coincidence of an almost three-fold increase in classroom disruptions and disciplinary reports along with the staff's direct observations of students using drugs or glamorizing drug and alcohol use led the administration to the inescapable conclusion that the rebellion was being fueled by alcohol and drug abuse as well as the student's misperceptions about the drug culture. It also became readily apparent to staff that, unless it took immediate action, the problem was going to get far worse and widespread before it got better. At one point, the administration felt that the only practical solution was

mass expulsion. Fortunately for the city of Vernonia, school officials remained vigilant in their efforts and continued to pursue less drastic alternatives.

Spurred on by an article in the local Oregonian, the idea of a drug testing program was considered. While the idea had been discussed before, concerns over its legality had deferred its consideration in favor of exhausting other alternatives. But sometime in 1988, borne out of necessity, the idea was investigated. A study was made of such programs across the country. Legal opinions were studied, legal counsel obtained, and parent meetings were held. Finally, with the blessing of the administration, a unanimous vote of parents at the meeting, and approval of the superintendent a plan was submitted to the School Board and approved for implementation beginning in the fall of 1989.

## II. *Defendant's Drug Testing Policy*

All students who desire to participate in interscholastic athletics are required to sign a form authorizing the District to conduct a test on a urine specimen provided by the student as a prerequisite to participation in the athletic program. The test requirement is applied to all students and is limited to determining whether the student has been using illegal drugs and/or alcohol.

All students in the athletic program are tested at the beginning of each athletic season in which they participate. During the season, student athletes are tested at random on a weekly basis. The names of all students participating in sports during that season are placed in a "pool" and approximately ten percent of the names are drawn from the "pool" each week. A student draws numbers representing names from the "pool," but is not aware of the names he or she draws. Students whose numbers are drawn are tested one at a time throughout that day.

The procedure for the test varies slightly for boys and girls. Boys begin the process by filling out of a portion of a specimen control form which assigns the student a number. The student is then given a test-

ing packet which contains a cup and a vial. The student enters an empty locker room with a male school official acting as a monitor. The monitor opens the packet and provides the student with the cup. The student then proceeds to a urinal to produce the sample. While producing the sample, the student remains fully clothed and has his back to the monitor. The monitor is present to assure that there is no tampering and remains 12 to 15 feet behind the student.

After producing the sample, the student returns the cup to the monitor. The monitor checks the sample for temperature and signs of tampering. The monitor then transfers the sample into a vial, and the student places a lid on the vial. The vial is sealed with security tape which the student signs and dates. The vial is assigned a number which coincides with the student's number on the specimen control form and then is placed in a plastic bag which is also sealed and signed and dated by the student. Finally, the student completes the specimen control form by verifying that the specimen is his and that the specimen and package were securely sealed in his presence.

The procedure for girls differs only in that a female school official acts as a monitor and the sample is produced in an enclosed stall with a toilet. The monitor remains outside the stall and listens for signs of tampering.

The samples are sent for testing to Metrolab under security procedures designed to protect the chain of possession. Metrolab technicians do not know the identity of the person being tested and rely solely upon the assigned numbers for identification. The test screens for amphetamines, cocaine, marijuana, and alcohol and has an accuracy of approximately 99.94%. Test results are reported by telephone to authorized Vernonia School District personnel. Positive results are also mailed to the district superintendent.

If a student's test is positive, a second test will be administered as soon as possible to confirm the results. Parents will be notified after the second positive test. If the second test is negative, no further ac-

tion will be taken. If the second test is positive, the school notifies the parents or guardians and conducts a hearing with the student and his or her parents. At this hearing, the student will be given the option of either participating in an assistance program and taking a weekly drug test for six weeks or suspension from the athletic program for the remainder of the current season and the next athletic season. The student will be retested before beginning the next season for which he or she is eligible.

At trial, Aultman testified that, though not spelled out in the written policy, a student athlete who commits a second offense may also continue participating in the athletic program if he or she submits to counseling and weekly urinalysis.

### III. *Basis of the Plaintiffs' Claim*

In the Fall of 1991, James Acton, a seventh grade student attending Washington Grade School in the Vernonia School District, signed up to participate in district-sponsored football. To participate in football, James had to take a physical examination.[1] James attended the first football practice and received the District's consent form for drug and alcohol testing. After discussing the form with his parents, they decided not to sign it. James and his parents scheduled a meeting with Aultman.

At the meeting, the Actons explained to Aultman that they objected to the drug testing policy because it required James to submit to a urinalysis in the absence of any evidence that he had used drugs or alcohol. Aultman informed the Actons that James could not participate in district-sponsored athletics without a signed consent form. The Actons notified the district superintendent, Ellis Mason, of their decision. Mason confirmed that James could not participate in district-sponsored sports without a signed consent form. There is no dispute that the policy was applied to James in the same manner as it was applied to all other

students who sought to participate in interscholastic athletics and was not based upon any individualized suspicion that James had used drugs or alcohol.

### DISCUSSION

#### I. *The Fourth Amendment*[2]

The Fourth Amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched and the persons or things to be seized."

The collection and testing of urine constitutes a "search" within the meaning of the Fourth Amendment. *Skinner v. Railway Labor Executives Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989). The urinalysis test is a "search," regardless of whether the act of urination is observed, because the test necessarily discloses facts about which an ordinary citizen has a reasonable expectation of privacy. *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175–6 (5th Cir.1987) *aff'd* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Procedures for collecting urine samples necessarily invade a personal function "traditionally shielded by great privacy." *Id.*, 109 S.Ct. at 1418. The Fourth Amendment applies to government searches undertaken for a purpose other than criminal law enforcement. *See e.g. National Treasury Employees Union v. Von Raab*, 109 S.Ct. at 1390 (urinalysis testing of customs service employees who face potential of dismissal must satisfy Fourth Amendment reasonableness requirement).

In the criminal context, the Fourth Amendment dictates that searches conduct-

---

**1.** The physical examination included giving a urine sample.

**2.** It is undisputed that defendant's drug testing program constitutes a "state action" for the pur-

poses of establishing the threshold constitutional inquiry. *See e.g. Brooks v. East Chambers Consol. Ind. School Dist.*, 730 F.Supp. 759, 762–3 (S.D.Tex.1989) *aff'd* 930 F.2d 915 (5th Cir.1991).

ed without a warrant are *per se* unreasonable, subject to a few well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The "essential purpose" of a warrant is to protect citizens' privacy interests and assure that any searches or seizures are "not the random or arbitrary acts of government agents." *Skinner*, 109 S.Ct. at 1415; *see also Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979) (proscriptions of Fourth Amendment designed to avoid the 'grave danger' of abuse of official discretion).[3]

The application of the Fourth Amendment to a civil administrative context is a relatively recent development in the law. The majority of the cases that have addressed this issue have done so in the employment context. For example, in *Skinner*, railroad employees challenged several provisions of the Federal Railroad Administration's regulations which required railroads to conduct urine, blood and breath tests following accidents or violations of certain safety rules to assist in its investigation and to take whatever remedial actions were necessary against employees. Positive tests could result in administrative discipline, including dismissal, but would not subject an employee to criminal prosecution. The Court noted that, given the factual context, "a warrant would do little to further these [governmental] aims." *Id.*, 109 S.Ct. at 1415. Further, the Court explained that although some "quantum" of individualized suspicion would "usually" be required in the absence of probable cause, that "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." *Id.*, at 1417.

The Court analyzed the challenged regulations by balancing the interests sought to be achieved by the government against the intrusion upon the employees' privacy to determine if the challenged tests were "reasonable." *Id.*, at 1421–1422; *see also Von Raab*, 109 S.Ct. at 1392 (applying *Skinner* balancing test to urinalysis tests of applicants for customs officials promotions). The Court found that the employees had a diminished expectation of privacy since they worked in a highly safety oriented industry which was already subject to significant regulation. *Id.*, 109 S.Ct. at 1417; *see also Von Raab*, 109 S.Ct. at 1392 (diminished expectation of privacy due to exposure to controlled substances); *IBEW Local 1245 v. Skinner*, 913 F.2d 1454 (9th Cir.1990) (upholding constitutionality of testing employees who work on natural gas and hazardous liquid pipelines); and *Bluestein v. Skinner*, 908 F.2d 451 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991) (upholding random urinalysis testing of airline personnel with safety responsibilities). The Court concluded that the government's "compelling" interests in railway safety outweighed the employees' privacy concerns. *Skinner*, 109 S.Ct. at 1421; *see also Von Raab*, 109 S.Ct. at 1396.[4]

Thus, although not expressly doing so, the Supreme Court appears to have abandoned the Fourth Amendment *"per se"* analysis utilized in criminal law in favor of a "balancing" test in which the government, in the absence of individualized suspicion or probable cause, must demonstrate a "compelling need" for the invasion which outweighs the individual's interest in privacy.[5] The Supreme Court's decisions in

---

**3.** In *Prouse*, the Court held that random automobile "safety checks" conducted by police officers *without the benefit of any objective criteria* to guide their discretion were unconstitutional. The Court noted however, that its holding "does not preclude ... states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." 440 U.S. at 664, 99 S.Ct. at 1401.

**4.** In *Von Raab*, the Court specifically rejected the employees' contention that the program was

invalid because there were so few positive results (approximately five tested positive out of 3600 tested) in light of the significant *deterrent* effect the tests would have on employees both on and off duty. *Id.*, 109 S.Ct. at 1394–5.

**5.** This is not meant to imply that there exists a separate and distinct "administrative" search doctrine. *See Schaill v. Tippecanoe County School Corp.*, 864 F.2d 1309, 1316, n. 7, *reh'g denied* (7th Cir.1988) (discussing debate surrounding 'administrative search' doctrine). Instead, as discussed more fully *infra*, I find that

*Skinner* and *Von Raab*, and the Ninth Circuit's decisions in *IBEW* and *Bluestein*, demonstrate that the government may show a "compelling need" which obviates the need for either a warrant or individualized suspicion if security or safety interests are implicated.

Although the types and magnitude of safety and security concerns addressed in *Skinner* and *Von Raab* differ from those faced by students, teachers and coaches who participate in middle and high school athletic programs, courts have acknowledged that the public school is a unique setting in which the constraints of the Fourth Amendment are "relaxed." In *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), a 14 year old student who was discovered smoking in the lavatory was taken to the assistant vice principal's office. Upon hearing the report, the assistant vice principal searched the student's purse for cigarettes. During the search, he discovered rolling papers, marijuana, a pipe, a fairly substantial amount of money and possible records of drug sales to other students. Thereafter, the state brought delinquency charges against the student and the admissibility of the items seized by the vice-principal was ultimately appealed to the Supreme Court. The Court held that the Fourth Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by public school officials, but that the school setting requires some "easing" of the restrictions to enable school administrators to preserve order and maintain an adequate educational environment. *Id.*, at 334, 340–41, 105 S.Ct. at 738, 742–43. Thus, although student athletes who use drugs do not pose the magnitude of a threat to society that, say, an intoxicated air traffic controller might, the fact that the searches take place within the school setting, as part of a program designed to maintain discipline, enforce athletic program regulations, and protect the safety of student athletes, is a significant factor that

must weigh heavily in any balancing process.

Further, relying upon the "fundamental command" of the Fourth Amendment that all searches be "reasonable," the Court in *T.L.O.* held:

"[T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the action was justified at its inception ... second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place."

*Id.*, at 341–42, 105 S.Ct. at 742–43 (citations omitted). In a footnote, the Court pointed out that it was not confronted with the issue of whether individualized suspicion was an essential element of the reasonableness standard. *Id.*, at 343 n. 8, 105 S.Ct. at 743 n. 8. However, the Court emphasized that the "Fourth Amendment imposes no irreducible requirement of such [individualized] suspicion." *Id.* Thus, although the context of the *T.L.O.* case involved the search of an individual student, the Court expressly held that "any search" of a student be measured by "reasonableness" based upon the totality of the circumstances and balancing of relative interests.

Whether and how the "reasonableness" analysis and rationale supporting the decisions in *Skinner, Von Raab*, and *T.L.O.* may be extended to an athletic program under guidelines adopted by a school board is a question that has yet to be directly addressed by either the Supreme Court or the Ninth Circuit. However, several other courts have confronted the issue. In *Schaill v. Tippecanoe County School District*, 864 F.2d 1309 (7th Cir.1988) *reh'g denied* (1989)[6], several students challenged the constitutionality of the school system's

---

the existence (or absence) of criminal penalties is but one factor which I must consider in determining the weight of individual privacy interests.

**6.** Although Tippecanoe was ultimately published in 1989, it predates the Supreme Court's decisions in *Skinner* and *Von Raab*.

program for random urine testing for inter-scholastic athletes. Under the program, all students desiring to participate in inter-scholastic athletics and their parents had to agree to submit to random urinalysis test-ing. A positive test would result in suspen-sion from participation in all or a portion of the athletic season unless the student agreed to participate in a drug treatment program. In light of the Supreme Court's holding in *T.L.O.*, the court began its in-quiry by noting that the probable cause and warrant requirements were not appli-cable to the program. Instead, the court found that the test should be under the "general Fourth Amendment standard of reasonableness." *Id.*, at 1315. However, because the program was premised upon a lack of *any* individualized suspicion, the court found that the school district bore a "heavier burden" to justify its contem-plated actions. *Id.; compare Brooks*, 730 F.Supp. at 764 (search of students must be based upon individualized suspicion absent "extraordinary" circumstances). Although the court did not quantify *how* heavy that burden should be, I find that the analysis presaged the Supreme Court's "compelling need" standard in *Skinner* and *Von Raab*. Accordingly, the court balanced the privacy interests of the students against the government's objectives and the nature and degree of the intrusion. Factors which the court found weighed in favor of the pro-gram's reasonableness included: first, the random nature of the testing which neces-sarily limited official discretion; second, the limited non-punitive purposes for the search; third, evidence to support a finding that the use of drugs posed a "particular threat" to athletes; fourth, evidence of at least three student injuries that had been caused or exacerbated by drug impairment; fifth, substantial evidence that alternatives methods of investigation would not ade-quately serve the school's goals; sixth, the diminished expectations that student ath-letes enjoy by the public nature of the events and by the existence of other regu-lations and restrictions; and seventh, the incorporation of adequate privacy safe-guards such as the strict limits on disclo-sure of test results and the lack of direct visual observation during the testing proce-dures.

In *Derdeyn v. University of Colorado*, 832 P.2d 1031 (Colo.App.1991), students challenged a drug testing program for in-tercollegiate athletics at the University of Colorado. In that program, a student was randomly selected for a rapid eye move-ment test which, if found positive, would lead to a urinalysis test. The court held that the University's interest in securing a drug free athletic program was not compel-ling and held that the testing procedures violated the Fourth Amendment of the U.S. Constitution. The court enjoined the Uni-versity from continuing the testing proce-dures in the absence of reasonable suspi-cion to believe that an athlete was using drugs. The court specifically noted that there was no evidence in the record to indicate that student athletes used drugs more than other persons of similar age among the general population and no evi-dence of actual drug problems or drug related injuries among University athletes. *See also Hill v. NCAA*, 7 Cal.App.4th 1738, 273 Cal.Rptr. 402, *petition for review granted* 276 Cal.Rptr. 319, 801 P.2d 1070 (1990) (college drug testing program invalid under California constitution given lack of evidence to show utility of program out-weighed students' privacy rights); and *Brooks*, 730 F.Supp. 759, 764–65 (urinalysis of all students participating in all extracur-ricular activities unconstitutional given lax-ity in testing procedures and lack of any evidence to show connection between drug use, participation in extra-curricular activi-ties and injuries sought to be avoided); and *Anable v. Ford*, 653 F.Supp. 22, 40–41, *modified in part* 663 F.Supp. 149 (W.D.Ark.1985) (finding urinalysis of indi-vidual students suspected of marijuana use unconstitutional given unreliable test re-sults and insufficient evidence to justify intrusive procedures utilized).

Based upon the guidance provided by these cases, I find that I must determine whether defendant's urinalysis testing pro-gram is "reasonable" in light of all of the justifications underlying the institution of

the program and the circumstances surrounding its administration. To assess the "reasonableness" of the program, I find that I must engage in a balancing test. Because defendant stipulates that it had no individualized suspicion that James had ever used drugs or alcohol, I find that the school district must demonstrate a "compelling need" for the program. Although it is impossible to define the term "compelling need" with any degree of specificity, I find that the cases discussed, *supra*, are instructive and provide an adequate "spectrum" by which I may measure the testing procedures and justification put forth in this case. The Supreme Court, in *Skinner* and *Von Raab*, teaches that a search may be "reasonable" in the absence of a search warrant or individualized suspicion where the safety and security interests of the public significantly outweigh the privacy interests of certain employees who work in industries that carry a high risk of serious accidents or who are exposed to illegal substances. *Brooks, Hill* and *Derdeyn* teach that a school may not justify a random urinalysis program upon amorphous statistics or generalized notions about the national drug problem. Finally, the Seventh Circuit Court of Appeals, in *Tippecanoe*, teaches that a school's random urinalysis program for interscholastic athletes which employs the least intrusive means possible to effectuate this goal may withstand constitutional scrutiny if based upon specific evidence of drug related injuries and disciplinary concerns.

In considering all of the evidence produced in this case, I find that there are several factors which weigh in favor of the district's drug testing policy. First, and foremost, there is evidence in the record of specific instances in which coaches have observed athletes perform poorly and unsafely while under the influence of some intoxicant. On one occasion, a wrestler was seriously injured and subsequently observed to smell of marijuana.

Next, there is evidence to show that athletes at Vernonia, perhaps more because of its rural setting, are role models for the entire community. The "Big Elks," the "Drug Cartel" or their successors are clearly leaders for other students and if they are deterred from drug use by threat of suspension from the athletic program, then it is reasonable for school administrators to believe that other students will also be deterred. The testimony of Dr. DuPont was particularly persuasive on the significant deterrent effects that a random drug testing program can have on a youthful population.

Further, the affected activity is limited in scope and narrowly tailored to effectuate the district's objectives. Unlike the policy challenged in *Brooks*, which applied random drug testing to all extra-curricular activities, the Vernonia policy is limited to the one activity which, in that community, is likely to have the greatest impact on the drug and alcohol abuse problem given the documented evidence of incidents involving particular students. The regulations already require that students undergo a physical examination prior to participation, the locker rooms themselves are open spaces and do not provide a great deal of privacy when students shower and change. Thus, drug testing is but one part of a substantial number of other rules and regulations governing athletes.

In addition, the middle to high school setting itself tends to favor the administration's policy given the stated goals and the deference that courts should accord school administrators in matters concerning discipline and maintaining order. I am satisfied by the evidence that defendant did not institute this policy to engage in a "fishing expedition" for drug and alcohol use to carry on a moral crusade. Rather, I find that defendant demonstrated that its concerns were for the limited purposes of addressing student safety in athletic programs and, ultimately, maintaining discipline in the classrooms.[7] As defendant ac-

---

**7.** I also note that while I find the *Derdeyn* and *Hill* cases helpful to my analysis of the law to apply, those cases involve college students who have, for the most part, reached the age of adulthood. University programs are far less structured, class attendance is voluntary and discipline is largely left to the students. I also note that the role of an athletic program on a

knowledges, the school plays a significant role in the development of its students and as such, owes a duty to take such steps as are reasonable and necessary to protect students from harm. Although it is purely speculative, I cannot help but wonder what liability defendant might have faced had it failed to take the next step in combatting the drug and alcohol problem when confronted with such clear evidence that students were abusing drugs and alcohol and engaging in sports.

Also significant is the fact that the school district considered and actually tried several alternative methods of dealing with the increase in drug and alcohol related disciplinary problems prior to instituting the drug testing program. As I noted earlier, the school instituted several educational programs designed to discourage drug use and found that the "subtle" approach not only failed, but seemed to cause further disruptions. Less intrusive 'screening" methods have proven to be ineffective. As Dr. DuPont explained, visual observations (even by professionals) are simply not reliable indicators of whether that student may have consumed alcohol or drugs. Du Pont testified that, although some people display outward manifestations of drug or alcohol use, many others do not, making application of the reasonable and individualized suspicion standard an unreliable and impractical tool to aid in preventing accidents before they happen. Thus, random drug urinalysis testing was seen as the next logical step in a progressive attempt to address the drug and alcohol problems.

I further find that defendant has taken significant steps to limit the extent of the intrusion. Students at Vernonia, like the employees subject to testing in *Skinner* and *Von Raab*, may produce the sample without a direct eye witness. Test results remain confidential and may only be used to suspend the student from participation in the athletic program—test results are not disclosed to criminal authorities and may not be used as the basis for school disciplinary proceedings such as suspension

or expulsions. The scope of the test is limited to the detection of illegal drugs and alcohol, thus ensuring that prescription drugs or contraceptive use will remain undisclosed. The testing procedures used, unlike those in *Anable*, are highly effective and have an accuracy of 99.94%.

Finally, the program limits the degree of discretion that may be exercised by coaches and school administrators. Testing during the season is random and thus, does not implicate the kind of unfettered discretion which raised the constitutional concerns surrounding automobile "safety checks" in *Delaware v. Prouse*.

When I balance all of the factors present in this case against James' legitimate expectations of privacy, I find that his privacy interests must give way to the district's need to maintain order and protect its students from injury by use of the least intrusive means available to it. Although I recognize that the program caters to the lowest common denominator and that students who have never consumed alcohol or drugs may suffer a degree of embarrassment, I feel that defendant has come forward with sufficient evidence to show that its drug testing program serves a "compelling need." I emphasize that my holding today is limited to the unique circumstances which confronted the Vernonia School staff. Defendant has proven, beyond all possible doubt, that it was faced with a crisis situation in attempting to maintain order and discipline. Based upon the observations of teachers and coaches, the district came to the inescapable conclusion that their problems were directly related to the students' unlawful use of alcohol and drugs. Further, the district's decision to target its athletic program for regulation given the predominant role that athletics play in this small rural community demonstrates that defendant made every effort to tailor this program to the least intrusive extent possible. Thus, whether a similar program could withstand constitutional scrutiny in large metropolitan schools or in

large University is far different than that of a rural middle school or high school with limited

alternative activities.

other small rural schools will necessarily depend, at a minimum, upon evidence of drug related problems, attempts to address the problems in less intrusive ways, and establishing a connection between the stated objectives and the means chosen to achieve those objectives.[8]

Based on the foregoing, I find that defendant's drug testing program was justified at its inception and is reasonably related in scope to the circumstances that exist in Vernonia. Accordingly, plaintiffs have failed to demonstrate that the defendant's drug testing program unconstitutionally interferes with their son's right to be free from unreasonable searches or seizures under the Fourth Amendment.

## II. *The Oregon Constitution, Article I § 9*

 Article I § 9 of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, house, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable case, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

In *State v. Owens*, 302 Or. 196, 206, 729 P.2d 524 (1986), the court stated that Article I, section 9 protects privacy interests, and that a "search" for constitutional purposes occurs when a person's privacy interests are invaded. The Oregon Supreme Court has interpreted Article I, section 9 independently, but parallel to federal court interpretations of the Fourth Amendment. *State v. Brown*, 301 Or. 268, 273, 721 P.2d 1357 (1986).

Oregon courts have not directly addressed administrative, non-criminal, suspicionless searches of the type presented by a school's random drug testing program.[9] However, in *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423 (1980) *cert. denied*, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981), the court addressed the constitutionality of game checkpoint stops.[10] During one of these checkpoint stops, Ms. Tourtillott was arrested for driving with a revoked license and was ultimately sentenced to imprisonment for one year. There was no dispute that the officers had neither probable cause nor reasonable suspicion to believe that the defendant had been involved in criminal activity at the time she was stopped. On appeal, the defendant argued that the stop violated Article I § 9 of the Oregon Constitution and the Fourth Amendment of the U.S. Constitution because the stop was not based upon reasonable suspicion. The court rejected the contention that reasonable or individualized suspicion was a necessary requisite for a valid stop. Instead, the court followed the reasoning from United States Supreme Court cases which upheld the constitutional validity of border searches and highway safety checks. *Id.*, 289 Or. at 854–857, 618 P.2d 423. Like the federal decisions, the Oregon court held that to determine the "reasonableness" of the checkpoint stop

---

**8.** For example, Vernonia's drug program might not be "reasonable" as applied to a large metropolitan high school where the students who engage in drug use may neither participate in, nor have contact with students who participate in interscholastic athletics.

**9.** Prior to 1980, the Court of Appeals examined and upheld the validity of administrative, non-criminal searches in four cases and treated the requirements of Oregon and federal search and seizure law as interchangeable. *See* the Discussion in 46 Op.Atty.Gen. —— (No. 8191, Nov. 16, 1987) (Slip op. at 25), *citing Eddie's Supper Club v. OLCC*, 23 Or.App. 493, 543 P.2d 19 (1975) (OLCC searches of licensed premises without warrants or individualized suspicion); *State ex rel. Accident Prev. Div. v. Foster*, 31 Or.App. 291,

570 P.2d 398 (1977) (statute allowing warrant to search business premises for safety violations may issue without individualized probable cause); *State v. Westside Fish Co.*, 31 Or.App. 299, 570 P.2d 401 (1977) (warrantless search of food processing plant by Fish and Game Commission); and *Accident Prevention Division v. Hogan*, 37 Or.App. 251, 586 P.2d 1132 (1978) (warrant issued without probable cause to determine compliance with safety regulation).

**10.** The roadblocks were manned by officers of the Oregon State Police Game Division and were set up to check hunters' compliance with the game laws, to check hunting licenses and to gather statistics on hunter success on the opening day of deer hunting season. *Tourtillott*, 289 Or. at 848, 618 P.2d 423.

procedures, it must balance the government's interest in the promotion of legitimate interests against the defendant's right to be free from unreasonable seizures. *Id.*, at 857–859, 618 P.2d 423. The Oregon court enunciated the following four factors which it considered particularly significant in determining the constitutionality of a particular government procedure:

(1) the importance of the governmental interest at stake;

(2) the psychologically and physically intrusive nature of the procedure;

(3) the efficiency of the procedure in reaching its desired goals; and

(4) the degree of discretion the procedure vests in the particular officers.

*Id.*, at 864, 618 P.2d 423. Although the court ultimately held that the game checkpoint was lawful, it emphasized that its holding was limited to determining the constitutionality of a stop, not a search. *Id.*, at 861, 618 P.2d 423. The dissent criticized the majority for its reliance upon Supreme Court decisions which involved administrative searches:

"I believe the majority errs in transferring that evaluation [of the degree of official discretion] from the context in which the Supreme Court developed it— the context of inspections for preventative or corrective purposes—to the different and wider context of seizures aiming at the discovery and punishment of past offenses."

*Id.*, at 873, 618 P.2d 423, Linde, J. dissenting.

Thereafter, in *Nelson v. Lane County*, 304 Or. 97, 743 P.2d 692 (1987), the court considered an appeal from a civil judgment in which the plaintiff sought civil remedies against three Oregon state police officers who stopped and detained her at a sobriety roadblock. On appeal, the state argued that the roadblock was justified under the reasoning in *Tourtillott* and as an administrative search. *Compare State v. Anderson*, 304 Or. 139, 743 P.2d 715 (1987) and *State v. Boyanovsky*, 304 Or. 131, 743

P.2d 711 (1987) (roadblocks designed to gather evidence for criminal prosecution of drunk drivers rather than administrative enforcement unconstitutional absent individualized suspicion). The three-justice plurality did not reach the issue of the constitutionality of the roadblock, but instead decided the case on statutory grounds, ruling that, unlike the game regulations which authorized the checkpoint in *Tourtillott*, there was no express legislative authorization to conduct the sobriety checkpoints. The court's holding appeared to be an outgrowth of the "unconstrained exercise of discretion" concern voiced by the Supreme Court in *Delaware v. Prouse*. Although the roadblock stops were not the product of a decision made by a single officer out in the field as in *Prouse*, the roadblocks were developed as part of the Oregon State Police Patrol Technique Manual—a group which is not "politically accountable," or specifically authorized by a politically accountable body to conduct such inspections. *Id.*, 304 Or. at 105, 743 P.2d 692. In *dictum*, the plurality suggested that sobriety checkpoints might be lawful if properly authorized and "providing sufficient indications of the purposes and limits of executive authority, and if carried out pursuant to a properly authorized administrative program designed and systematically administered to control the discretion of non-supervisory officers." *Id.*, at 104, 743 P.2d 692, *citing State v. Atkinson*, 298 Or. 1, 9–10, 688 P.2d 832 (1984).[11] Two dissenting justices argued that the majority had failed to adequately consider the state's interest in protecting its citizens from harm suffered by intoxicated drivers and would apply the four-part test of *Tourtillott*. *Id.*, 304 Or. at 115–119, 743 P.2d 692, Peterson, C.J. dissenting.

Although Oregon courts have not directly addressed the issues in this case or the legal standards to be applied to administrative searches under Article I § 9 of the Oregon Constitution, I find that the Supreme Court's decisions in *Tourtillott* and *Nelson* provide me with sufficient guidance

---

**11.** In *Atkinson,* the court held that warrantless, suspicionless non-criminal "inventory" searches of lawfully impounded cars were permissible under Article I § 9 if properly authorized and administered in a systematic, non-discretionary fashion. *Id.,* 298 Or. at 10, 688 P.2d 832.

to determine the validity of the challenged drug testing program in this case. This finding is influenced, to a large extent, by the parties' stipulation that jurisdiction is proper in this court. I agree with counsel that remanding the state constitutional challenge to the state court at this stage in the proceedings would not serve the interests of judicial economy, efficiency or be required in the interests of comity. *Compare Castellano v. Board of Trustees,* 937 F.2d 752, 758 (2nd Cir.), *cert. denied* — U.S. ——, 112 S.Ct. 378, 116 L.Ed.2d 329 (1991) (holding court 'should' dismiss supplemental state constitutional claim in interest of comity).

In light of *Nelson,* I find that I must first determine whether the drug testing procedures in this case were properly .''authorized.'' Under the Oregon statutes, school districts are considered "corporate bodies." O.R.S. 332.072. School boards in each district are expressly authorized to "transact all business coming within the jurisdiction of the district and to sue and be sued." *Id.* Further, school boards are charged with responsibility "for educating children residing in the district" which includes determining "what things are detrimental to the successful management, good order and discipline of the schools and the rules required to produce these conditions." *Id;* and *Burkitt et al. v. School District No. 1, et al.,* 195 Or. 471, 492, 246 P.2d 566 (1952) (citations omitted). This grant of authority expressly includes the power to develop a drug abuse program as provided by O.R.S. 336.222:

> "In accordance with rules adopted by the State Board of Education ... each district school board shall adopt a comprehensive drug abuse policy and implementation plan including, but not limited to ... alcohol and drug abuse preventions curriculum and public information programs ..."

Unlike the Oregon State police department, which is an executive agency, the Vernonia School Board is a politically accountable body. Each board member is elected by the voters in the District area. Each is subject to recall and must face reelection. Thus, voters who oppose the policy may lobby the board and voice their objections through the electoral process.

Based on the foregoing, I find that the challenged drug testing program is authorized by Oregon statutes and was properly promulgated and implemented by the Vernonia School District.

■ As a preliminary matter, I note that the Oregon Supreme court has not directly addressed the issue of whether a urinalysis test is a "search." However, Oregon courts have held that a "search" occurs when a person's privacy interests are invaded. *Owens,* 302 Or. at 206, 729 P.2d 524. In *State v. Milligan,* 304 Or. 659, 748 P.2d 130 (1988), the court held that compelled extraction of blood constitutes a search under Article I § 9. I find that a urinalysis test is a "search" under Article I § 9 of the Oregon constitution.

Having determined that the drug policy is properly "authorized" pursuant to Oregon law and that the urinalysis test is a "search," I now turn to the issue of whether the program is valid under Article I § 9 of the Oregon Constitution. Based upon the court's holding in *Tourtillott,* I find that the relevant inquiry is whether the program is "reasonable." The "reasonableness" of the program must be determined by balancing the school district's asserted interests against the plaintiffs' right to be free from unreasonable intrusions into his privacy. In conducting this balancing test, I shall consider each of the four factors articulated by the court.

The first factor is the importance of the governmental interest at stake. 289 Or. at 864, 618 P.2d 423. In this case, the school district's interest in preventing and deterring drug and alcohol abuse among the student population is highly significant. As I noted previously, there is ample evidence in the record to support the district's claim that alcohol and drug use were the primary causes of disruptions and disciplinary problems during school hours. Further, there is evidence which tends to show that alcohol and drug use contributed to an athlete's injury and/or would eventually lead to additional injuries.

The second factor is the psychologically and physically intrusive nature of the procedure. *Id.* Again, as discussed in greater detail *infra*, I find that the district program uses the least intrusive method possible by insuring the confidentiality of the test results and by permitting students to produce the sample without direct witness observation. Most significantly however, is the fact that the search program was instituted to correct behavior and deter future unlawful conduct—it was not designed to punish the students for past conduct and does not expose the students to possible criminal sanctions or investigation.

The third factor, the efficiency of the procedure in reaching the desired goals, is best demonstrated by the results actually achieved in this case. Disciplinary reports are back down to "normal" levels and there have been no subsequent reports of athletic injuries attributable to drug or alcohol use. As the school officials testified, the program runs smoothly and causes no disruptions to either the school or athletic program.

The final factor, the degree of discretion left to individual officers, is not implicated by the program at all since testing is required of all applicants and then conducted on a random, lottery-type basis during the course of the season.

When I consider all of these factors in light of the unique circumstances present in the Vernonia School district, I find that the balance of interests weighs heavily in favor of the government's interests in maintaining a healthy and productive scholastic atmosphere. Accordingly, I find that the challenged program is "reasonable" under Article I § 9 of the Oregon Constitution.

## CONCLUSION

Based on the foregoing, I find that defendant's drug testing program is reasonable under the Fourth Amendment of the United States Constitution and Article I § 9 of the Oregon Constitution. Accord-

ingly, plaintiffs' claims for injunctive and declaratory relief are denied.