# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3227

_____

Pathe Miller, a minor, by and through    *
his parent and guardian, Troy Miller,    *

           *

         Appellant,    *

           *

     v.    *

           *

Bobby Wilkes, in the official capacity    *
as a member of the Cave City School    *
District Board of Education; Donald    *
Simmons, in the official capacity as a    *
member of the Cave City School    *
District Board of Education; Johnny    *
Wayne Carter, in the official capacity    *   Appeal from the United States
as a member of the Cave City School    *   District Court for the
District Board of Education; Randy    *   Eastern District of Arkansas.
Hodges, in the official capacity as a    *
member of the Cave City School    *
District Board of Education; Michael    *
Higginbottom, in the official capacity    *
as a member of the Cave City School    *
District Board of Education; Larry    *
Brown, in his official capacity as    *
Superintendent of the Cave City School    *
District,    *

           *

         Appellees.    *

_____

Submitted: February 12, 1999
Filed: March 31, 1999

_____

Before BOWMAN, Chief Judge, FAGG, and HANSEN, Circuit Judges.
_____

BOWMAN, Chief Judge.

Pathe Miller, by his parent and guardian Troy Miller, appeals from the order of the District Court[1] granting summary judgment to the members of the Cave City, Arkansas, School District Board of Education and to the Superintendent of the School District (collectively, the School District) on Pathe's Fourth Amendment challenge to a portion of the chemical screening policy promulgated by the School District. We affirm.

I.

Beginning with the 1997-98 school year, the School District instituted a "Chemical Screen Test Policy for Cave City Schools," which provides, inter alia, for random testing of urine samples from students in grades seven through twelve. The immunoassay performed on the samples screens for illegal drugs (including misused prescription drugs) and alcohol, and also tests for the metabolites of such substances. Each student and the student's custodial parent or guardian must sign a form giving consent for the student to be tested should he or she be randomly selected. For so long as the student or parent refuses to give written consent, the "student shall [not] be allowed to participate in any school activity (any activity outside the regular curriculum)." Chemical Screen Test Policy at 4.[2] (In addition, a student's refusal to

_____

[1]The Honorable Susan Webber Wright, Chief Judge, United States District Court for the Eastern District of Arkansas.

[2]The policy, as it is reproduced in the joint appendix, is numbered for the appendix (beginning with page number 19) and also carries numbers (apparently

submit to the test when randomly selected, notwithstanding a signed consent form, will result in the student's being barred from participating "in any school activity for the remainder of the school year." Id. at 2.) If the sample from a student who is selected for testing is positive for prohibited drugs or alcohol, the student will be put on probation for twenty days.[3] The student's parent or legal guardian will be notified of the positive result and counseling or rehabilitation will be recommended. "After twenty-one days, the student will be tested again at the student's own expense . . . ." Id. If the student tests positive again after the probationary period, he will be banned from participating in extracurricular school activities for one calendar year. After one year, the student will be allowed to participate in school activities only upon testing negative for the prohibited substances. Test results are retained by the superintendent or his designee, secured in a locked file and maintained separately from a student's regular school files. The files are to be destroyed upon a student's graduation or two years after the termination of enrollment in the Cave City schools.

Pathe Miller has averred that he wishes to participate, and would participate, in such school activities as the Radio Club, prom committees, the quiz bowl, and school dances, among others. Pathe and Troy Miller, however, refuse to consent to Pathe's participation in the random testing program and therefore Pathe is not permitted to engage in any extracurricular activities. Pathe, by Troy Miller, sought declaratory and injunctive relief, alleging that the random testing required by the drug and alcohol

---

beginning with page number 37) indicating that in its original form it is only one part of a more inclusive writing that is not otherwise identified. For the sake of clarity in this opinion, we have taken the liberty of renumbering the five-page policy as a separate document, and we use those numbers in our citations.

[3]The student has the option of requesting a confirmation test within twenty-four hours of receiving the first positive test result. This verification test will be performed at the student's expense. A negative result from the retest, which will be run with a gas chromatography/mass spectrometry procedure, considered a more accurate test than the immunoassay screen, will supersede the original positive result.

screening policy violates Pathe's constitutional rights under the Fourth and Fourteenth Amendments. The District Court granted summary judgment for the School District on Pathe's constitutional claim. We review the decision de novo. See Maitland v. University of Minn., 155 F.3d 1013, 1015 (8th Cir. 1998).

## II.

Under the express terms of the Constitution, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. By way of the Fourteenth Amendment, the strictures of the Fourth Amendment apply to searches and seizures by state officials and, it has been determined, apply "to searches conducted by public school officials." New Jersey v. T.L.O., 469 U.S. 325, 333 (1985). Further, it is now established that "the collection and testing of urine" is a search within the meaning of the Fourth Amendment. Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617 (1989). It is undisputed, then, that Pathe is challenging a search that comes within the scope of the Fourth Amendment, and therefore the search cannot be "unreasonable" if it is to be held constitutional. U.S. Const. amend. IV; see also Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995).

Under the provision of the School District's chemical screening policy that is challenged here, the search at issue–the random acquisition and analysis of a urine sample–is not supported by a warrant, probable cause, or individualized suspicion. As the law has developed, however, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989). Officials may be permitted to dispense with the warrant and probable cause requirements "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement." Id.; see also id. at 668 ("[I]n certain limited circumstances, the Government's need to

discover . . . latent or hidden [hazardous] conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting [administrative, as compared with criminal,] searches without any measure of individualized suspicion."). The Supreme Court has held that the public school environment provides the requisite "special needs" so that a school district may dispense with those Fourth Amendment protections. Vernonia, 515 U.S. at 653; see also T.L.O., 469 U.S. at 341 ("[T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search."). Therefore, as in Vernonia, neither a warrant issued upon a finding of probable cause nor individualized suspicion of drug or alcohol use is required for the School District's searches to be constitutional. But in the absence of such protections against an unconstitutional search, and in cases like this where the search in question could not have been anticipated by the Framers of the Constitution, the search must be shown to be reasonable under a balancing test devised by the Supreme Court. See Vernonia, 515 U.S. at 652. We weigh "the scope of the legitimate expectation of privacy" and "the character of the intrusion that is complained of" against "the nature and immediacy of the governmental concern . . . and the efficacy of [the search] for meeting it." Id. at 658, 660.

In Vernonia, the school district was experiencing an increase in drug use among students, and a concomitant rise in discipline problems. It had been determined that student "athletes were the leaders of the drug culture." Id. at 649. In 1989, the school district implemented a drug policy that applied to all students who wished to participate in the district's athletic programs. Student athletes and their parents were required to give written consent for the students to be tested for certain substances, not only routinely before the start of the season for the sport selected by the student, but also randomly throughout the school year. In the absence of such consent, students were not permitted to participate in school athletics. The Supreme Court applied the balancing test and held that the policy in Vernonia was constitutional.

III.

In considering the first factor on the privacy side of the scale, we examine the scope of any legitimate privacy interest that may be jeopardized by the School District's proposed search. Our analysis in this case is informed at the outset by the Supreme Court's conclusion that children in the public school setting have a lower expectation of privacy than do ordinary citizens. See id. at 656 ("[T]he nature of [students' constitutional] rights is what is appropriate for children in school."). The essence of a public school's power over children "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults," and the "reasonableness inquiry" cannot ignore this fact of life. Id. at 655, 656. For the Vernonia Court, in fact, student status was fundamental to its conclusions concerning the diminished expectation of privacy: "*Central*, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." Id. at 654 (emphasis added). Moreover, as the Court observed, all public school students are subject to requirements for physical examinations and vaccinations against disease, and to routine screenings for, inter alia, hearing and vision loss. Therefore, "[p]articularly with regard to medical examinations and procedures," all students have a limited expectation of privacy in the public school environment. Id. at 656-57.

Pathe argues that the fact that the policy in Vernonia applied only to student athletes was more significant to the Supreme Court in reaching its decision than was the fact that the policy applied to students who were attending public school. We read the case differently. But see id. at 666 ("I comprehend the Court's opinion as reserving the question whether the District, on no more than the showing made here, constitutionally could impose routine drug testing not only on those seeking to engage with others in team sports, but on all students required to attend school.") (Ginsburg, J., concurring). The Court did say that "[l]egitimate privacy expectations are *even less*

with regard to student athletes." Id. at 657 (emphasis added).[4]  That is not to say, however, that it is only the student who seeks to engage in extracurricular school sports activities whose legitimate expectation of privacy is so diminished that a search such as this one can stand up to constitutional scrutiny.  As we noted above, the Vernonia Court observed that simply being a student in a public school is "[c]entral" to a lowered expectation of privacy.

We presume that student athletic programs are among the activities from which students may be barred for refusing to be tested under the School District's policy.  Granted, the Cave City policy goes beyond student athletics to include all manner of extracurricular activities.  Nevertheless, as with athletics, there are features of extracurricular but non-athletic school activities that will lower the privacy expectation of those who opt to participate to a point below that of fellow students.  Notwithstanding that they may not be as rigorous as those relating to student athletic programs, extracurricular clubs and activities will have their own rules and regulations for participating students that do not apply to students who do not wish to take part in such activities.  As with student athletes, someone will monitor the students for compliance with the rules that the clubs and activities dictate.  Thus students who elect to be involved in school activities have a legitimate expectation of privacy that is diminished to a level below that of the already lowered expectation of non-participating students.

Moving on, then, "to the character of the intrusion that is complained of," id. at 658, our analysis closely tracks the Vernonia Court's treatment of this factor.  Under

---

[4]The Court noted that student athletes must disrobe and shower in locker rooms notorious for lacking privacy.  Also, athletes are required to undergo routine preseason physical exams, and they must follow various rules regarding insurance, minimum grades, practice sessions, and conduct that may be more stringent than those to which ordinary students are subject.

the terms of the Cave City policy, the "student will be allowed to provide the [urine] specimen in a stall or other partitioned area that allows for individual privacy." Chemical Screen Test Policy at 3. This procedure for collecting samples is no more intrusive on the privacy rights of students than the one required by the drug testing policy at issue in Vernonia. The Court there commented that the "conditions are nearly identical to those typically encountered in public restrooms, which . . . schoolchildren use daily," and concluded that "the privacy interests compromised by the process of obtaining the urine sample are . . . negligible." Vernonia, 515 U.S. at 658.

As for the "other privacy-invasive aspect of urinalysis . . . , the information it discloses concerning the state of the subject's body, and the materials he has ingested," the policy here is on point with Vernonia's policy. Id. The procedure that is used screens only for drugs and alcohol (and their metabolites), not for medical conditions, and the test determines the presence or absence of the same substances in every random sample, regardless of the identity of the student who provides it. The results are reported only to the superintendent or his designee. The consequences of a positive test do not include, as far as we can tell from the record, notification of law enforcement authorities or expulsion or suspension from classes. Point by point, this "intrusion" aspect of the Cave City policy is nearly identical to that of the policy at issue in Vernonia, where the Court found the encroachment on the legitimate expectation of privacy to be "not significant."[5] Id. at 660.

_____

[5]The Supreme Court did find that one aspect of Vernonia's policy "raise[d] some cause for concern" regarding unwarranted intrusion on privacy. Vernonia, 515 U.S. at 659. That is, the Court expressed some unease about the requirement that students randomly selected for testing reveal "*in advance* prescription medications they are taking." Id. The Cave City policy states that "[a]ny student undergoing medical treatment prescribed by a physician that requires the use of and [sic] drug or medication capable of affecting the student's mental or physical capabilities must notify the appropriate school official at the time of testing." Chemical Screen Test Policy at 2. (Cave City's policy actually appears to be narrower than Vernonia's, as the Cave City

## IV.

We turn now to the School District's concern that is purported to be addressed by the policy, both the "nature and immediacy" of the concern and "the efficacy of [random testing] for meeting it." Vernonia, 515 U.S. at 660. The nature of the problem, well known for years and well documented, is substance abuse in the public schools. "Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." T.L.O., 469 U.S. at 339; cf. Von Raab, 489 U.S. at 674 (stating that "drug abuse is one of the most serious problems confronting our society today" and approving of suspicionless random searches of customs agents who carry firearms or who are involved in drug interdiction). Acknowledging the deepening drug and alcohol problem in public schools, the Vernonia Court said, "Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs, which was the governmental concern in Von Raab . . . ." Vernonia, 515 U.S. at 661. The nature of the general concern is no different here than it was in Vernonia. As noted in the Cave City policy, the School District "recognizes that chemical abuse or misuse is a significant health problem for students, detrimentally affecting overall health, behavior, learning ability, reflexes, and the total development of each individual." Chemical Screen Test Policy at 1.

---

student need report only those prescribed medications "capable of affecting . . . mental or physical capabilities.") As did the student plaintiff in Vernonia, Pathe challenges the policy on its face, not as applied to him, and there is no indication that the information about prescription medications could not be provided confidentially, and treated so, unless the test results come back positive. See Vernonia, 515 U.S. at 659-60. Therefore, like the Supreme Court, "we will not assume the worst" and will not invalidate the policy on this ground. Id. at 660.

We must acknowledge, however, that there is not the same "immediacy" here as there was in Vernonia, and this is where the facts before us differ most significantly from those the Supreme Court faced when declaring Vernonia's drug testing policy to be constitutional. There is no "immediate crisis" in Cave City public schools, Vernonia 515 U.S. at 663; indeed, there is no record evidence of any drug or alcohol problem in the schools. We do not believe, however, that this difference must necessarily push the Cave City policy into unconstitutional territory, as it does not mean that the need for deterrence is not imperative. "A demonstrated problem of drug abuse [is] not in all cases necessary to the validity of a testing regime . . . ." Chandler v. Miller, 117 S. Ct. 1295, 1303 (1997) (citing Von Raab, 489 U.S. at 673-75).

Drug and alcohol abuse in public schools is a serious social problem today in every part of the country. (Indeed, to the extent any party thinks it necessary to do so, we take judicial notice of that fact. See Fed. R. Evid. 201 (generally known fact).) Perhaps no public school is safe from the scourge of drug and alcohol abuse among its students, and it is in the public interest to endeavor to avert the potential for damage, both to students who abuse and to those students, teachers, family members, and others who are collaterally affected by the abuse, before the problem gains a foothold. Even though no harm evidently is yet quantifiable in the Cave City schools, we conclude that "the *possible* harm against which the [School District] seeks to guard is substantial." Von Raab, 489 U.S. at 674-75 (emphasis added). We see no reason that a school district should be compelled to wait until there is a demonstrable problem with substance abuse among its own students before the district is constitutionally permitted to take measures that will help protect its schools against the sort of "rebellion" proven in Vernonia, one "fueled by alcohol and drug abuse as well as the student's [sic] misperceptions about the drug culture." Acton v. Vernonia Sch. Dist. 47J, 796 F. Supp. 1354, 1357 (D. Or. 1992) (subsequent history omitted), quoted in Vernonia, 515 U.S. at 663. Demonstrating a drug or alcohol problem the severity of which approaches that endured by the Vernonia schools certainly "would shore up an assertion of special need for a suspicionless general search program." Chandler, 117 S. Ct. at 1303. But we

-10-

conclude that, given the compelling state interest in discouraging drug and alcohol abuse, and also given the considerable risk of immediate harm once the problem surfaces, the "nature and immediacy" of the governmental concern provides strong support for the random testing policy at issue in this case. See Von Raab, 489 U.S. at 675 n.3 ("It is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context.").

The Millers have not given us any reason to doubt the efficacy of the random testing policy as a measure to discourage drug and alcohol abuse and thus to prevent such abuse from becoming a problem in the Cave City schools. In addition, the policy addresses both the School District's concern for providing a safe environment in which students can learn and interact socially, and its correlative concern for the reputation of its schools.

We conclude, then, that the School District has a substantial and sufficiently immediate concern in deterring substance abuse among its students, and that the random testing policy cogently addresses that concern.

V.

Having determined (1) that Cave City public school students who participate in extracurricular activities have a lowered expectation of privacy and that the random testing's intrusion upon that expectation is not significant, and (2) that the School District has an important and immediate interest in discouraging drug and alcohol use by its students and that the random testing policy serves to promote that interest, we come now to the final step in our analysis: the balancing. Weighing the minimal intrusion on the lowered expectation of privacy against the district's concern and the essentially unchallenged efficacy of its policy, we conclude that the School District's interest is "*important enough* to justify the particular search at hand." Vernonia, 515 U.S. at 661. That is, the Cave City School District has proved that the random testing

-11-

policy is reasonable within the meaning of the Fourth Amendment. Key for us is the fact that any random searches conducted pursuant to this policy will be of children in the public school system. As the Supreme Court concluded in <u>Vernonia</u>, the "*most significant element* in this case is . . . that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." <u>Id.</u> at 665 (emphasis added). That conclusion is equally applicable here. It is clear from the facts in <u>Vernonia</u> (if anyone would doubt it) that substance abuse in the schools causes discipline problems, inattentiveness, and general disruption in the classroom; attendance and tardiness problems; and overall health problems for the students–all of which interfere with teaching and learning. <u>See also</u> <u>T.L.O.</u>, 469 U.S. at 342 n.9 ("The maintenance of discipline in the schools requires . . . that students be restrained from . . . abusing drugs and alcohol . . . ."). Moreover, "[s]chool years are the time when the physical, psychological, and addictive effects of drugs are most severe." <u>Vernonia</u>, 515 U.S. at 661. When the mission of the public schools can be so thoroughly thwarted by substance abuse among the pupils, a random search policy such as the one at issue here, which is designed to effectively deter students who may be disposed to such abuse, is reasonable and therefore constitutional.

VI.

We hold that the challenged portion of the Chemical Screen Test Policy for Cave City Schools as written is constitutional under the Fourth and Fourteenth Amendments.[6] The judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]Our decision today comports with an opinion from the Seventh Circuit in a case that is nearly identical to this one on the facts. See Todd v. Rush County Sch., 133 F.3d 984 (7th Cir.), cert. denied, 119 S. Ct. 68 (1998); see also, Willis v. Anderson Community Sch. Corp., 158 F.3d 415 (7th Cir. 1998), cert. denied, 1999 WL 42264 (U.S. Mar. 22, 1999) (No. 98-1183) (holding that required drug testing of student who had been suspended for fighting was unconstitutional because there was no reasonable suspicion of drug use and no "special needs" requiring a suspicionless search, distinguishing Todd and Vernonia on their facts).