Lindsay **EARLS**, a minor, by her next friends and parents, John David **EARLS** and Lori Earls; and Daniel **James**, by his next friend and mother, Leta Hagar, Plaintiffs,

v.

**BOARD OF EDUCATION OF TECUMSEH PUBLIC SCHOOL DISTRICT, Independent School District No. 92 of Pottawatomie County, Oklahoma; and Tecumseh Public School District, Independent School District No. 92 of Pottawatomie County, Oklahoma; Defendants.**

No. Civ–99–1213–R.

United States District Court, W.D. Oklahoma.

March 9, 2000.

**1282**

Micheal C. Salem, Salem Law Office, Norman, OK, Graham A. Boyd, New Haven, CT, for plaintiffs.

William P. Bleakley, Stephanie J. Mather, Linda M. Meoli, The Center for Education Law, Oklahoma City, OK, for defendants.

Margaret McMorrow–Love, Oklahoma City, OK, for Amicus.

### ORDER

DAVID L. RUSSELL, Chief Judge.

Before the Court are the parties' cross-motions for summary judgment. Both sides seek summary judgment on the Plaintiffs' claims for declaratory and injunctive relief.

### I. *Summary of the Evidence.*

The Plaintiffs, Lindsay Earls and Daniel James, are students at Tecumseh High School. The Defendants, Board of Education of Tecumseh Public School District and Tecumseh Public Schools, operate the school and establish and implement its policies. For many years, Tecumseh High School has offered a range of student activities, including choir, marching band, color guard, Future Farmers of America and Future Homemakers of America, which were generally open to all students who wished to participate. The school has also offered various team sports and other activities to a limited number of students on a competitive basis. The vast majority of students participate in one or more school-sponsored activities. Plaintiff Lindsay Earls is a member of the show choir, the marching band and the academic team. Plaintiff Daniel James "seeks to participate" in the academic team in the 1999/2000 school year, and is enrolled in the academic team class.[1]

On September 14, 1998, the school district adopted the Student Activities Drug Testing Policy ("the Policy"), which requires all students who participate in extracurricular activities to submit to suspicionless drug testing. (See Plaintiff's Exhibit "O"). By its terms, the Policy requires that "any student that represents Tecumseh Schools in any extracurricular activity such as FFA [Future Farmers of America], FHA [Future Homemakers of America], Academic Team, Band, Vocal, Pom Pon, Cheerleader and Athletics," will be barred from participating in such activities unless the

---

1. The Defendants do not expressly contest either Plaintiff's standing to challenge the drug testing policy. However, the Court notes that the Defendants make allegations about Plaintiff Daniel James which call his standing into question. The Defendants' evidence indicates that Daniel James has been attending school in the District since March of 1998. He failed five academic subjects in the 1998/1999 school year, and failed the Academic Team class in the 1999/2000 school year, and was suspended from school in the 1998/1999 school year for a violation of District policy against carrying electronic pagers. Therefore, the Defendants contend, Daniel James is ineligible to participate in any interscholastic competition sanctioned by the OSSAA for this entire school year. The Plaintiffs argue that Daniel James' disciplinary suspension was unfair or unreasonable. There is some dispute as to whether the suspension was the cause of Mr. James' failing grades. The Plaintiffs contend that the suspension automatically caused Mr. James to fail his courses due to excessive absences, and the Defendants contend that the failures were unrelated to the suspension. The Court finds it unnecessary to resolve this dispute under the circumstances. Because there is no suggestion of lack of standing on the part of Plaintiff Lindsay Earls, the Court must reach the merits of the Plaintiffs' constitutional attack on the District's drug testing policy in any event.

student submits a written consent ·to drug testing.[2] Students are required to undergo drug testing before participating, randomly during the year while participating, and at any time while participating in competitive activities upon reasonable suspicion. The test used by the District detects only amphetamines, cannabinoid metabolites (marijuana), cocaine, opiates, ·barbiturates and benzodiazepines.[3] A yearly fee of four dollars is charged for each student participating in the drug testing program.[4] It is conceded that the Policy has been applied, since its inception, only to those extracurricular activities of a competitive nature.[5] The student Plaintiffs and their parents challenge those provisions of the Policy which require suspicionless drug testing of students participating in non-athletic activities.[6]

## II. *Reasonableness of the Policy.*

 The state-compelled collection and testing of urine constitutes a "search" governed by Fourth Amendment principles of reasonableness. *Vernonia School District 47J v. Acton,* 515 U.S. 646 at 652 – 653, ·115 S.Ct. 2386 at 2390, 132 L.Ed.2d 564 (1995). Under the challenged Policy, the random acquisition and analysis of a urine sample is not supported by a warrant, probable cause, or individualized suspicion. As the Supreme Court has held, however, neither a warrant, nor probable cause, nor any measure of individualized suspicion is an indispensable component of reasonableness in every circumstance. *Vernonia, supra; National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665 – 668, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Officials are permitted to dispense with the warrant and probable cause requirements where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement. *Id.*

### A. *Existence of a Special Need.*

The Supreme Court has historically found "special needs" to exist in the public school context, where the warrant requirement "would unduly interfere with the

**2.** See Plaintiffs' Exhibit "O." The original draft of the Policy covered only those students engaged in athletic competition. Prior to its adoption, however, the Policy was expanded to include "any extra-curricular activities."

**3.** Upon reasonable suspicion, students may be tested for other substances identified in the Policy, including alcohol and anabolic steroids.

**4.** The Defendants allege in their brief that the $4.00 fee is waived for students who cannot afford to pay it. In support of this assertion, the Defendants cite the deposition testimony of two teachers, Carolyn Daugherty and Danny Jacobs. Ms. Daugherty testified that she advised her students that if they had a problem with the fee, they should come to her and "they could work it out." (Deposition of Carolyn Daugherty, p. 70). Mr. Jacobs testified that he was sure that someone in the school administration or a faculty member or sponsor would cover the fee if necessary. (Deposition of Danny Jacobs, pp. 134 – 135). The Plaintiffs point out that the Defendants have not shown that the District has established an official policy of waiving the fee for underprivileged students. However, the Plaintiffs have not argued that the fee is unreasonable, or shown evidence that the fee has excluded any student from participating in extracurricular activities. Thus, the Court finds no constitutional deprivation arising out of the $4.00 annual fee.

**5.** It is undisputed that the Policy has been applied only to those extracurricular activities which involve some aspect of competition, and which are sanctioned by the Oklahoma Secondary Schools Activities Association ("OSSAA").

**6.** The Plaintiffs do not challenge the Policy insofar as it applies to athletes, or insofar as it provides for drug testing upon reasonable, individualized suspicion. The Defendants point out that Plaintiff Daniel James is a member of Life Guides, a group sponsored by the Youth and Family Resource Center in Shawnee, Oklahoma, which has its own drug testing policy. The Court does not consider Mr. James' participation in Life Guides to have much bearing upon his objection to the School District's drug testing policy. First, Life Guides is not an official, school-sponsored organization, and second, the Life Guides drug testing program calls for suspicion-based testing. See Deposition of Daniel James, Defendants' Exhibit "J," pp. 141–142.

maintenance of the swift and informal disciplinary procedures [that are] needed," and "strict adherence to the requirement that searches be based upon probable cause" would · undercut "the· substantial need of · teachers and administrators for freedom to maintain order in the schools." *Vernonia*, 515 U.S. at 653, 115 S.Ct. at 2391, *citing New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733,· 83 L.Ed.2d 720. (1985).[7] In *Vernonia*, the Supreme Court found that a public school· district had ·sufficiently demonstrated a special need justifying a similar drug testing policy.[8]

The Plaintiffs argue that the Defendants have ·not made ·a similar showing ·of a "special need" beyond the need for normal law enforcement.[9] As the Plaintiffs point out, in approving the drug testing policy at issue in . *Vernonia*, the Supreme Court stressed both the severity and the immediacy of the drug problem in the school district. ·The Court agreed with the district court's conclusion that "a large segment of the student body" was "in a state of rebellion," that disciplinary· actions "had reached epidemic proportions," and that these problems were being "fueled by alcohol and drug abuse as well as by the students' misperceptions about the drug culture." 515 U.S. at 662–663, 115 S.Ct. at 2395.[10]

7. The Supreme Court has also upheld suspicionless, warrantless searches and seizures to conduct drug testing of railroad personnel involved in train accidents, *see Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); to conduct random drug testing of federal customs officers who carry arms or are involved in drug interdiction, *see National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); and to maintain automobile checkpoints looking for illegal immigrants and contraband, and drunk drivers, *see United States v. Martinez–Fuerte*, 428 U.S. 543, 560 – 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); *and Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In each of these cases, the Supreme Court balanced the intrusion on individuals' privacy interests against the promotion of legitimate governmental interests. Under that balancing equation, on one side, the Court examined the nature of the privacy interest upon which the search at issue intrudes and the character of the intrusion. *See Vernonia, supra*. On the other side, the Court considered the nature and immediacy of the governmental concern at issue, and the efficacy of the challenged test for meeting it. *Id. See also 19 Solid Waste Department Mechanics v. City of Albuquerque*, 156 F.3d 1068, 1072 (10th Cir.1998).

8. As explained more fully below, the Vernonia School District's policy was limited to student athletes, whereas the Policy challenged here applies to all students participating in competitive extracurricular activities.

9. *See Vernonia, supra, quoting Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987).

10. The ·Supreme Court in *Vernonia* concurred ·with the trial court's finding that the school district's concerns were "immediate," citing evidence of rampant drug abuse and a "drug culture" within the student body. The evidence in that case indicated that a "large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion;" that disciplinary actions had reached "epidemic proportions," and that the "rebellion was being fueled by alcohol and drug abuse as well as the students' misperceptions about the drug culture." Teachers and administrators had observed a sharp increase in drug use. Students were beginning to speak out about their attraction to the drug culture, and to boast that there was nothing the school· could do about it. Disciplinary referrals in the district had risen sharply, and several students had been suspended. School officials observed that students had become increasingly rude during class, and that outbursts of profanity had become common. 515 U.S. at 648–649, 115 S.Ct. at 2388–2389. Not only were student athletes included among the drug users, but athletes were the leaders of the drug culture in that school. The Court cited evidence that .drug use increases the risk of sports-related injury. One athletic coach had witnessed a severe sternum *injury* suffered by a wrestler, and various omissions of safety· .procedures and misexecutions by football players, all of which the coach attributed to the effects of drug use. The Court described · the school administration as being "at its wits end,'' and noted that a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of ·rebellion. The Court termed the situation ·an "immediate crisis of

Although the *Vernonia* Court emphasized the severity of the drug problem in that school, this Court does not view the majority's holding in *Vernonia* to be limited to those circumstances where the drug problem is of such magnitude. The Supreme Court has found special governmental needs to justify suspicionless drug testing in other contexts, without first finding a pervasive drug problem among the group to be tested. *See, e.g., Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Upholding regulation requiring suspicionless drug testing of railroad employees involved in train crashes); *Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d. 685 (Sustaining a Customs Service program requiring drug tests as a condition of promotion or transfer to positions directly involving drug interdiction or requiring the employee to carry a firearm).[11] In these cases, the Court's findings of special need were not based upon any evidence of pervasive drug abuse among the groups to be tested; instead, the Court's findings were based on the fact that drug abuse by members of the targeted group presents special concerns. As the Supreme Court explained in *Vernonia,* illegal drug use by adolescent schoolchildren also presents special concerns.

The Plaintiffs' interpretation would mean that random drug testing of students by public school districts is not reasonable where illegal drug abuse by minor children is known to exist within a particular school unless the problem is shown to have reached epidemic proportions. This interpretation is plainly at odds with the Supreme Court's recognition of the heavy responsibility imposed upon school officials for the education, guidance and well-being of the minor children placed in their care, and the Court's recognition of the devastating effects of drug abuse by school children.

Admittedly the evidence in this case does not show an epidemic of illegal drug abuse in the Tecumseh School District. There is some evidence of student drug abuse dating back to the 1970's, which has continued to exist in more recent years. The school board president and three teachers testified on deposition that they had heard students speaking openly about using drugs in recent years.[12] Two teachers also testified that they had seen students who appeared to be under the influence of drugs.[13] Even the two student

greater proportions than existed in *Skinner,*" and "of much greater proportions than existed in *Von Raab.*" 515 U.S. 646 at 662 – 663, 115 S.Ct. 2386, 2395, 132 L.Ed.2d 564.

**11.** *Cf. Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (Striking Georgia's requirement that candidates for state office pass a drug test because it was not supported by a showing of special need).

**12.** Dean Rogers, current president of the school board, testified that a girl had called her during the 1997–1998 school year, and told her that someone was passing a marijuana cigarette around in a classroom. (Defendants' Exhibit "C," p. 145). Ms. Rogers testified that she once overheard a conversation in which a boy who was in the FFA invited some other boys to a party, telling the boys that he would have "plenty of smoke," which Ms. Rogers understood to mean marijuana. (Defendants' Exhibit "C," pp. 145–147). Ms. Rogers also testified that her granddaughter once told her that a boy was "bombed out,"

and that a teacher had asked the boy if he was all right. On one occasion a girl called Ms. Rogers to tell her that a marijuana cigarette was being passed around in a classroom. These incidents reportedly occurred during the 1997–1998 school term. Teacher Sheila Evans testified that she has been "amazed" to hear students in her classes speaking so freely about marijuana use. Ms. Evans testified that she has overheard students talking about the use of drugs in the last five years. Teacher Danny Sterling further testified that he had occasionally heard students openly talking about using drugs, and that these students showed no fear of being overheard by him. Defendants' Exhibit "I," pp. 78–79. Vocal music teacher and choir director Carolyn Daugherty testified that she has heard from students that other students were using drugs. (Deposition of Carolyn Daugherty, Plaintiffs' Exhibit "A," p. 45).

**13.** Deposition of Carolyn Daugherty, Plaintiffs' Exhibit "A," pp. 45–47; deposition of Danny Sterling, Defendants' Exhibit "I," testimony of Danny Sterling, p. 78.

Plaintiffs have acknowledged that there is some drug abuse by Tecumseh High School students.[14] In recent years a drug dog has found marijuana cigarettes near the boundary of the school parking lot, and has alerted on a vehicle which contained "small particles and seeds of marijuana."[15] Police officers once found drugs or drug paraphernalia in a car driven by an FFA member.[16]

According to the School Board President, over the last two years, "people all over the community" were becoming more "aware" of the drug problem in the Tecumseh school.[17] In February 1998, a parent contacted the School Board President to discuss her concerns about drug use in the school. Later, this parent appeared at an open meeting of the School Board and openly discussed how drug use was affecting her son and his friends.[18] In the fall of 1998, "people were calling the [school] board members" to talk "about the drug situation."[19] Each of these situations arose after the District had taken numerous other measures to discourage drug abuse by its students.[20]

In determining whether the Defendants have demonstrated a "special need" suffi-cient to justify suspicionless drug testing, the Court does not focus solely upon the evidence of actual use or possession of illegal drugs by students. Consistent with the Supreme Court's analysis in *Vernonia*, the Court considers not only this evidence, but such other factors as the cultural or social atmosphere in which students spoke openly of illegal drug use, even in the presence of teachers; phone calls to school board members from parents; and the public plea of a concerned mother who implored the school board to "do some-thing" about the problem of drug use among the high school's students.[21]

The Plaintiffs cite several cases for the proposition that drug testing programs may be upheld under the special needs doctrine only when applied to individuals whose activities affect safety. *See, e.g., Bolden v. Southeastern Pennsylvania Transportation Authority*, 953 F.2d 807, 823 (3rd Cir.1991), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992); *Laverpool v. New York City Transit Authority*, 835 F.Supp. 1440, 1455 (E.D.N.Y.1993), *aff'd*, 41 F.3d 1501 (2nd Cir.1994); *Plane v. United States*, 750 F.Supp. 1358, 1369 (W.D.Mich.1990); *Burka v. New York City Transit Authority*,

14. Shortly after filing this lawsuit, Plaintiff Lindsay Earls appeared on a national televi-sion news program and stated that there is a widespread drug problem in the District. La-ter, in her deposition, Plaintiff Earls testified that she now does not know whether the drug problem in the District is widespread. (See Defendants' Exhibit "G," testimony of Lind-say Earls, pp. 20–25, 26, 29). Plaintiff Daniel James testified on deposition that he has per-sonally, physically observed "about twelve" students of Tecumseh High School under the influence of illegal drugs. Defendants' Exhib-it "J," p. 234. Plaintiff James made this statement in response to a question about parties he had attended at which students seemed to be under the influence of drugs. He did not indicate that these twelve students had actually used drugs at school, nor did he suggest that they appeared to be under the influence at any official school function.

15. Plaintiffs' Exhibit "E," Deposition of James Blue, pp. 38–41, 43, 136.

16. Defendants' Exhibit "C," pp. 170–171.

17. Defendants; Exhibit "C," p. 71.

18. Defendants' Exhibit "C," pp. 78–79.

19. Defendants' Exhibit "C," p. 78.

20. Prior to adopting the drug testing policy, the District had implemented several edu-cational programs and security measures de-signed to deter drug use. The District active-ly observes "Red Ribbon Week" each school year, during which anti-drug rallies are held and students are urged to pledge to remain drug-free. The school also uses "victim im-pact" speakers, and a program referred to as the "Grim Reaper" program. The school uses drug dogs to search school property, has been provided with a city police officer to patrol the high school, and has installed sur-veillance cameras. (Defendants' Exhibit "I," Defendant's Exhibit "J," pp. 54–57).

21. The Court finds the fact that some sixteen parents have joined in an amicus curiae brief in favor of the drug testing policy to be some indication of parental support for the Policy.

739 F.Supp. 814, 822 (S.D.N.Y.1990); *and Gonzalez v. Metropolitan Transportation Authority*, 174 F.3d 1016 (9th Cir.1999). Each of these cases involved adults challenging mandatory drug testing in the employment context. Together, these cases establish that certain jobs carry a diminished expectation of privacy because their duties carry a substantial threat to safety. As explained in *Gonzalez, supra*, children committed to the temporary custody of the state as schoolmaster *also* have a substantially diminished expectation of privacy as compared to adults, simply because of their protected status.[22]

·The Plaintiffs attempt to refute the Defendants' evidence with statements made by school officials in the School District's annual applications for funding from the Safe and Drug Free Schools and Communities program over the years.[23] The statements, contained in each of several applications, indicate that although controlled substances were "present" within the school, illegal drug use was "not a major problem at this time." These statements are inherently subjective and imprecise, and in no way refute the Defendants' evidence that there was a drug problem at the school at the time the Policy was adopted. In fact, although these state-ments optimistically ·portray the drug problem as "not major," they acknowledge that the problem did exist. Viewing the evidence as a whole, it cannot be reasonably disputed that the Defendant School District was faced with a "drug problem" when it adopted the Policy.[24]

While the evidence in this case does not show a drug problem of epidemic proportions, or a student body in a state of rebellion, it certainly shows legitimate cause for concern. This Court is well aware of the prevalence of illegal drugs in our society, including our schools. The undersigned has observed, far too frequently, the devastating effects of illegal drug use, not only upon the users, but upon the countless others whose lives are touched.. The Supreme Court has observed that drug abuse among public school students causes discipline problems, inattentiveness, and an atmosphere of disruption in the classroom. In such an environment, the mission of the school is thwarted, to the detriment of both the drug-impaired pupils and the innocent. Illegal drugs are known to cause overall health problems for users, and to pose serious safety risks for others. As the Supreme Court emphasized in *Vernonia, supra*, the·school years are the time when

---

**22.** The Court further observes that of the Plaintiffs' cases cited above, all except *Gonzalez* were decided before the Supreme Court addressed the issue of drug testing in public schools in *Vernonia*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

**23.** The Plaintiffs cite isolated comments contained in an application the District submitted in prior years to the state Department of Education under the Drug Free Schools and Communities Act of 1986. In these applications, school officials wrote: "The use of tobacco and alcohol continue to be our number one problem. Our students utilize alcohol primarily on the weekends and use tobacco, especially smokeless tobacco, on a more regular basis. Other types of drugs, including controlled dangerous substances, are present but have not identified themselves as major problems at this time." (Plaintiffs' Exhibit "B," pp. 291, 303, 344). In context, it appears that the author meant that drugs were not believed to be a "major"·problem as com-pared to alcohol and tobacco. Even the Plaintiffs' interpretation would not warrant a different result. Despite the rather optimistic assurance that drugs were not a "major" problem, the District has amply demonstrated that the possession and use of illegal drugs, and an atmosphere of apparent acceptance of drug use by students were sufficiently serious problems to warrant a finding of "special need.".

**24.** See *Todd v. Rush County Schools*, 133 F.3d 984 (7th Cir.), *cert. denied*, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998), in which the Seventh Circuit upheld a drug testing policy ·in a school district which presented some evidence of drug use ·by students, but clearly did not show that student drug abuse had reached epidemic proportions, or that the student body was in a state of rebellion. The evidence is more fully outlined in the district court opinion. See *Todd v. Rush County Schools*, 983 F.Supp. 799 (S.D.Ind.1997).

the physical, psychological and addictive effects of drugs are most severe. Maturing nervous systems are even more critically impaired by intoxicants than mature ones are, and childhood losses in learning are lifelong and profound. Children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor. The effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted. Citing these facts, the Supreme Court has recognized that the importance of deterring drug use by all this nation's schoolchildren "can hardly be doubted." *Vernonia*, 515 U.S. 646, 661, 115 S.Ct. 2386, 2395, 132 L.Ed.2d 564. It would seem rather anomalous to require school officials to await an epidemic before taking peremptory measures. Having considered all of these factors, the Court finds that the Defendants have demonstrated a "special need" sufficient to justify the random drug testing policy at issue here.

B. *Nature of the Privacy Interest Involved.*

As established in *Vernonia*, the first factor to be considered in determining the

reasonableness of a search is the nature of the privacy interest on which it intrudes. 515 U.S. at 654, 115 S.Ct. at 2391. The *Vernonia* Court noted that the subjects of the school district's drug testing policy were minor children who had been committed to the temporary custody of the state as schoolmaster. In that capacity, the Supreme Court explained, the state may exercise a degree of supervision and control greater than it could exercise over free adults. *Id.*[25] The Court explained that because public school children are required to submit to physical examinations and be vaccinated, they have a lesser privacy expectation with regard to medical examinations and procedures than the general population.[26] Student athletes have even less of a legitimate privacy expectation, because an element of communal undress is inherent in athletic participation, and because athletes are subject to preseason physical exams and rules regulating their conduct. 515 U.S. at 657, 115 S.Ct. at 2391–2393.[27] Thus, in the context of public school students, particularly student athletes, the expectation of privacy is significantly reduced.

The Plaintiffs challenge the Policy at issue here on the ground that it is not limited to student athletes, as was the challenged policy in *Vernonia*, but includes all students participating in any extra-curricular activities of a competitive nature.[28]

**25.** "Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Vernonia*, 515 U.S. 646 at 655, 115 S.Ct. 2386 at 2392.

**26.** The Court pointed out: "For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases. According to the American Academy of Pediatrics, most public schools 'provide vision and hearing screening and dental and dermatological checks.... Others also mandate scoliosis screening at appropriate grade levels.... Particularly with regard to medical examinations and procedures, therefore, students within the public school environment have a lesser expectation of privacy than members of the pop-

ulation generally.'" *Vernonia*, 515 U.S. at 655, 115 S.Ct. at 2392, citations omitted.

**27.** The Court stated: "School sports are not for the bashful. They require 'suiting up' before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford." 515 U.S. at 657, 115 S.Ct. at 2393.

**28.** The Plaintiffs point out that the Tecumseh Policy, by its terms, is not limited to those extracurricular activities of a competitive nature. Rather, the written Policy states that it applies to "member[s] of any middle school or high school Tecumseh Public School District sponsored extra-curricular organization." The Policy further provides: "This includes any student that represents Tecumseh Schools in any extra-curricular activity such as FFA, FHA, Academic Team,, Band, Vocal, Pom Pon, Cheerleader, and Athletics." (Exhibit "O" at p. 2).

The Plaintiffs argue that, unlike athletes, their privacy expectations have not been lowered beyond those of ordinary students by virtue of their participation in extracurricular activities.

It is true that in *Vernonia*, the Supreme Court stressed that the school district's policy was directed narrowly to drug use by athletes, where the risk of immediate physical harm to the user and other players is particularly high,[29] and further observed that the school district's drug problem was particularly acute among its athletes. However, this Court does not read *Vernonia* as limiting a public school district's authority to conduct drug searches to student athletes. The Supreme Court did say that "[l]egitimate privacy expectations are even less with regard to student athletes." 515 U.S. at 657, 115 S.Ct. at 2392. That is not to say, however, that among public school students it is only athletes whose legitimate expectation of privacy is so diminished that a search such as this one can withstand constitutional scrutiny. *See Miller By and Through Miller v. Wilkes*, 172 F.3d 574 (8th Cir.1999);[30] *Todd v. Rush County Schools*, 133 F.3d 984 (7th Cir.)

(Approving a drug testing policy which included all students participating in "extracurricular activities," including athletic teams, the student council, foreign language clubs, Fellowship of Christian Athletes, Future Farmers of America officers and the library club), *cert. denied*, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998). The *Vernonia* Court observed that simply being a student in a public school is "central" to a lowered expectation of privacy.[31]

Granted, student athletes are more likely than other students to disrobe and shower in locker rooms notorious for their lack of privacy. Student athletes also undergo routine preseason physical exams which are presumably not required of students participating in non-athletic activities. Nevertheless, as with athletics, there are features of non-athletic, extracurricular school activities that will lower the privacy expectation of those who opt to participate to a point below that of fellow students. *Miller v. Wilkes, supra.*[32] Although they may not be as rigorous as those relating to student athletic programs, extracurricular clubs and activities, particularly those of a competitive nature,

**29.** The Court stated, in *Vernonia:*
"Apart from psychological effects, which include impairment of judgment, slow reaction time, and a lessening of the perception of pain, the particular drugs screened by the District's Policy have been demonstrated to pose substantial physical risks to athletes. Amphetamines produce an 'artificially induced heart rate increase, peripheral vasoconstriction, blood pressure increase, and masking of the normal fatigue response,' making them a 'very dangerous drug when used during exercise of any type.' .... Marijuana causes 'irregular blood pressure responses during changes in body position,' 'reduction in the oxygen-carrying capacity of the blood,' and 'inhibition of the normal sweating responses resulting in increased body temperature.' .... Cocaine produces 'vasoconstriction, elevated blood pressure,' and 'possible coronary artery spasms and myocardial infarction.'"
515 U.S. at 662, 115 S.Ct. at 2395.

**30.** The Court notes that the panel opinion in *Miller v. Wilkes, supra,* was vacated by order dated June 15, 1999. In that order, the court

found that appellant Miller was no longer a student in the appellee school district, and vacated both the district court's judgment and the judgment on appeal as moot. The court further denied the appellant's petition for rehearing en banc as moot.

**31.** The Supreme Court in *Vernonia* cautioned against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts. 515 U.S. at 665, 115 S.Ct. 2386. The Court explained: "The most significant element in this case is the first we discussed: that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." *Id.* Hence, it was the drug testing policy's application to students attending public school, not its exclusive application to student athletes, which the Court found to be central to its analysis. *Id. at* 654, 115 S.Ct. 2386.

**32.** See footnote 32 *supra.*

will have their own rules and requirements for participating students that do not apply to the student body as a whole. For example, each of the competitive activities to which the Policy has been applied is subject to the rules of the Oklahoma Secondary Schools Athletic Association ("OSSAA").[33] As with team sports, a faculty sponsor will monitor the students for compliance with the various rules that the clubs and activities dictate. Thus, students who elect to be involved in school activities have a legitimate expectation of privacy that is diminished to a level below that of the already lowered expectation of non-participating students.[34] The Court rejects the Plaintiffs' argument that the Defendant's drug testing policy is unreasonable because it includes non-athletes.

## C. *Character of the Intrusion.*

The Court next addresses the character of the intrusion imposed by the District's drug testing policy. This analysis is informed at the outset by Supreme Court precedent establishing that minor children in the public school setting have a substantially lower expectation of privacy than do ordinary citizens. *Vernonia,* 515 U.S. at 656, 115 S.Ct. at 2392–2393. The nature of the student Plaintiffs' constitutional rights is what is appropriate for children in school. The essence of a public school's authority over children "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults," and the "reasonableness inquiry" cannot ignore this fact of life.

As the Supreme Court explained in *Vernonia,* although collecting samples of urine intrudes upon "an excretory function traditionally shielded by great privacy," the degree of intrusion depends upon the manner in which production of the urine sample is monitored. 515 U.S. at 658, 115 S.Ct. at 2393, *citing Skinner,* 489 U.S. at 626, 109 S.Ct. at 1418, 103 L.Ed.2d 639 (1989).

When drug testing is conducted at the Tecumseh schools, the students to be tested are called out of class in groups of two or three. The students are directed to a restroom, where a faculty member serves as a monitor.[35] The monitor waits outside the closed restroom stall for the student to

---

**33.** OSSAA rules require, among other things, that participating students maintain minimum standards of scholastic eligibility, i.e., that they not have a failing grade in any class during the semester in which they are participating, and that they have not failed a certain number of classes in the preceding semester. The Plaintiffs maintain that the OSSAA eligibility rules are applied quite broadly, so that a number of student groups not covered by the Policy are nevertheless subject to OSSAA rules.

**34.** The Defendants also point to evidence that on some occasions, students participating in non-athletic activities compromise their privacy in ways comparable to that of athletes. For example, students competing in non-athletic activities travel out of town and out of state more frequently than the general student population. On these occasions, students sometimes sleep together in a dormitory setting, or share motel rooms. They may also share communal restroom facilities. (Deposition of Lindsay Earls, Defendants' Exhibit "G," pp. 37 – 45).

**35.** The Policy provides, in part:

"All aspects of the drug use testing program, including the taking of specimens, will be conducted so as to safeguard the personal and privacy rights of the student to the maximum degree possible. The test specimen shall be obtained in a manner designed to minimize intrusiveness of the procedure. In particular, the specimen must be collected in a restroom or other private facility behind a closed stall. The principal/athletic director shall designate a coach or school employee of the same sex as the student to accompany the student to a restroom or other private facility behind a closed stall. The monitor shall not observe the student while the specimen is being produced, but the monitor shall be present outside the stall to listen for the normal sounds of urination in order to guard against tampered specimens and to insure an accurate chain of custody. The monitor shall verify the normal warmth and appearance of the specimen."

See also Deposition of Danny Jacobs, Plaintiffs' Exhibit "B," pp. 180 – 182; Deposition of Grant Gower, Plaintiffs' Exhibit "F," pp. 44 – 46; Deposition of James Blue, Plaintiffs' Exhibit "E," pp. 79, 88.

produce the sample.[36] The monitor pours the contents of the vial into two bottles. Together, the faculty monitor and the student seal the bottles. The student is given a form to sign, which is placed, along with the filled bottles, into a mailing pouch in the presence of the student. Random drug testing was conducted in this manner on approximately eight occasions during the 1998/1999 school year. Approximately twenty students were tested each time.[37] Although some students have expressed embarrassment over the drug testing procedure,[38] it is the same basic procedure described in *Vernonia* as "nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily." [39] 515 U.S. at 658, 115 S.Ct. at 2393. The Supreme Court has characterized the privacy interests compromised by the process of collecting such urine samples as "negligible." *Id.*

The other privacy-invasive aspect of urinalysis is, of course, the information it discloses concerning the state of the subject's health, and the materials the subject has ingested. *Vernonia,* 515 U.S. at 658, 115 S.Ct. at 2393. As in *Vernonia,* the tests in question are designed to reveal only the presence of certain standard drugs, not medical conditions, and do not vary according to the identity of the student. The Policy provides that test results will be kept in confidential files separate from the students' other educational records, will be released only to those school personnel who "have a need to know," and will not be turned over to law enforcement authorities. 115 S.Ct. at 2393–2394. (Policy, Plaintiffs' Exhibit "O," p. 5). Test results are not used for any internal disciplinary function. (*Id.*).[40]

The Plaintiffs allege that students who refuse to consent to testing under the Poli-

---

**36.** Under the Tecumseh drug testing policy, both male and female students produce their samples in the privacy of a closed restroom stall. In *Vernonia,* male students produced their sample standing at a urinal.

**37.** Deposition of Grant Gower, Plaintiffs' Exhibit "E," pp. 44 – 46.

**38.** (Deposition of Carolyn Daugherty, Plaintiffs' Exhibit "A," p. 94). According to Ms. Daugherty, approximately ten percent of her students have complained about the drug testing procedure. Four students have dropped the choir class since the Policy was implemented, one of whom told Ms. Daugherty that she was dropping the class because of the drug testing policy. (Id. at p. 95). Grant Gower testified that some students gave sideways looks to each other, and giggled and snickered during the testing procedure. (Deposition of Grant Gower, Plaintiffs' Exhibit "E," pp. 46 – 47). Plaintiff Lindsay Earls testified: "It's just kind of embarrassing for someone to be standing outside your stall listening to you while you use the restroom. It was kind of embarrassing." (Deposition of Lindsay Earls, pp. 91 – 92). Plaintiff Earls testified that one faculty member, the sponsor of the cheerleading squad, joked to her that she felt she was engaging in potty training. (*Id.* at 92). Plaintiff James testified that he considers being asked to provide a urine sample in order to participate in competitive activities to be disrespectful and humiliating. Mr. James does not necessarily object to providing a urine sample for his job at K–Mart or

for Life Guides, which is not a school sponsored activity. (Deposition of Daniel James, Defendants' Exhibit "J," pp. 141 – 142).

**39.** The Plaintiffs argue that providing a urine sample under the Policy is more intrusive than the ordinary process of using a public restroom. Under the Policy, students providing a urine sample must urinate into a cup while a faculty member waits outside the stall, listening for the "normal sounds" of urination. The student must then hand the cup to the faculty member, who checks it for warmth, color and clarity while the student watches. (Plaintiffs' Exhibit "O"). Obviously, one does not usually encounter these particular intrusions when using a public restroom. Nevertheless, the procedure is otherwise the same as that encountered in a typical public restroom. The procedure used in Tecumseh is identical to that described with approval by the Supreme Court in *Vernonia,* except that in Tecumseh, both male and female students are afforded the privacy of a closed stall. The Court finds that the procedure employed by the Defendants for collecting urine samples is not unduly intrusive.

**40.** The Tecumseh Policy does provide for students who test positive for drugs to participate in counseling sessions, and for repeat offenders to be excluded from participation in extracurricular activities. Test results are not, however, used to subject students to disciplinary detention, suspension or expulsion

cy may suffer disciplinary measures or academic consequences. Although the Policy expressly provides that no academic sanctions will be imposed for violations,[41] the Plaintiffs contend that school officials have failed to ensure that teachers know and follow the "no sanction" provision. The Plaintiffs offer no evidence of any students actually suffering such disciplinary or academic consequences from refusing to consent to drug testing. At most, the Plaintiffs' evidence suggests that there was, in the beginning, some degree of confusion among some students and some faculty members as to whether a refusal to consent would affect a student's standing or enrollment in a competition-related class.[42] Nevertheless, it is clear that the District's official policy, and actual practice, has been to allow students refusing to consent to drug testing to remain in the corresponding class. These students are permitted, and required, to participate in classroom activities for graded classroom work, as are all students who are ineligible for interscholastic competition.[43]

The Plaintiffs have also offered evidence that some faculty members give extra credit to students who compete in certain activities.[44] However, there is no evidence that students who refuse to consent to drug testing are treated any differently with regard to extra credit than any other non-competitors, or that any students' grades have been lowered because of their refusal to consent to drug testing.[45]

from school, or any other internal disciplinary function.

**41.** The Policy provides:
"The sanctions imposed for violations of this policy will be limitations solely upon limiting the opportunity of any student determined to be in violation of this policy to a student's privilege to participate in extracurricular activities. No suspensions from school or academic sanctions will be imposed for violations of this policy."
Plaintiffs' Exhibit "O," p. 1.

**42.** Apparently, students who participate in an extracurricular activity usually enroll in a corresponding course for academic credit. For example, student members of the Future Farmers of America enroll in an agriculture course, and that members of the school choir enroll in a vocal music class. The Plaintiffs contend that the Policy has been applied in a manner which has led students to believe that refusal to consent to drug testing will affect their class enrollment and their grades in these classes. At the meeting in which the Policy was explained to faculty members, school board member Danny Jacobs advised the faculty that any student who refused to participate in the drug testing program would remain in the class, and that there would be no academic sanction. (Plaintiffs' Exhibit "B," pp. 316 – 317). High School Principal James Blue acknowledged in his deposition testimony that at least one faculty member incorrectly assumed that students who sign up for the competition classes intend to compete. Plaintiffs' Exhibit "E," pp. 145 – 146. However, Mr. Blue explained that there are a number of reasons why a student enrolled in a competition-related class may not actually compete. For example, a student who has enrolled in a class may simply decide not to compete, or may not be selected for the team. (Plaintiffs' Exhibit "E"). Whereas enrollment in "competition" classes is generally available to students who sign up, membership on a team is not guaranteed based on class enrollment. As an example, Mr. Blue testified that there are currently 16 students enrolled in the academic team class, of whom only four will be chosen as starting members of the competition team. (Plaintiffs' Exhibit "E"). Presumably, a student enrolled in a competition-related class might also become unable to compete because of injury, illness, or other personal circumstances. These students, like those who refuse drug testing, are nevertheless permitted to remain in the class without being penalized.

**43.** See Affidavit of Nancy Warwick, Defendants' Exhibit "J."

**44.** Teacher Danny Sterling testified on deposition that students enrolled in his agriculture classes can earn extra credit, and thus improve their grades, by competing in livestock shows. (Deposition of Danny Sterling, Plaintiffs' Exhibit "H," pp. 13 – 14). Mr. Sterling further testified that teachers "strongly encourage" all agriculture students to be members of the FFA, and to compete in the FFA shows so that they can apply what they have learned in the agriculture class. Deposition of Danny Sterling, pp. 28 – 30.

**45.** Mr. Sterling testified that participating in livestock competitions "can just only help the grade, not hurt it." Sterling deposition, pp. 13 – 14.

The Plaintiffs maintain that the Policy provides no protection against a student's positive drug test results becoming known to the school's general population, and allege that one student's positive test is already "widely known among students." The Plaintiffs surmise that a student could, hypothetically, reveal his own test results, or that his test results could become public knowledge by virtue of his sudden withdrawal from competitive activities shortly after being tested. The Court concludes that neither the unspecified allegation that one student's test results have become "widely known," nor speculation that future test results could become known, demonstrates an undue privacy invasion.[46] The Policy expressly provides for confidentiality of test results, and the Court must assume that the confidentiality provisions will be honored.

The Plaintiffs complain that the term "need to know" is not defined in the Policy, and that the District has, in practice, decided that athletic coaches and activity sponsors have a "need to know" that one of their students has tested positive. *Vernonia* specifically approved of the procedure of disclosing test results to a limited class of school personnel who have a need to know. The Court finds the term to be self-explanatory, and finds no fault with the School District's decision to treat the coaches and sponsors of the activities affected as having a need to know. It is inherently reasonable to advise an athletic coach or activity sponsor of the reason why a student under his or her tutelage has been declared ineligible to practice or compete.

Next, the Plaintiffs argue that the District's procedure for collecting prescription drug information is unreasonably intrusive. The Plaintiffs complain that when consent forms were being collected, the choir teacher "looked at students' list[s] of prescription drugs and left the lists where other students could see them." (Plaintiffs' Brief in Opposition to Defendants' Summary Judgment Motion). The Plaintiffs further allege that during the testing process, students were again required to list all of their prescription drugs on a form reviewed by at least one teacher or coach, as well as the principal or athletic director.

The deposition testimony cited by the Plaintiffs in support of this proposition indicates that the teacher or coach to whom the form was submitted reviewed each consent form to make sure they included a parent's signature, the student's signature, and the requested medical information.[47] The Supreme Court in *Vernonia* found that a similar provision, requiring students to identify in advance prescription medication they were taking, "raise[d] some cause for concern." 515 U.S. 646, 659, 115 S.Ct. 2386, 2394, 132 L.Ed.2d 564. "On the other hand," the Court reasoned, "we have never indicated that requiring advance disclosure of medications is per se unreasonable." *Id.* The Court reasoned:

> "It may well be that, if and when [a student] was selected for random testing at a time that he was taking medication, the School District would have permitted him to provide the requested information in a confidential manner—for ex-

---

**46.** Obviously, a student who reveals his own test results thereby waives any privacy interest he may claim in that regard, and is hardly in a position to complain of the lack of confidentiality. *See, e.g, Doe v. City of New York,* 15 F.3d 264 (2nd Cir.1994); *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia,* 812 F.2d 105, 111 (3rd Cir.1987) (right to privacy can be waived). A student who divulges his test results to his classmates has no reasonable expectation of keeping those test results private. Furthermore, although it

seems obvious that no confidentiality provision could prevent high school students from gossiping or from guessing, correctly or incorrectly, that a classmate who withdraws from extracurricular activities has failed a drug test, the Tecumseh policy includes confidentiality provisions similar to those approved by the Supreme Court in *Vernonia.*

**47.** Testimony of Carolyn Daugherty, Plaintiffs' Exhibit "A," p. 80.

ample, in a sealed envelope delivered to the testing lab. Nothing in the Policy contradicts that, and when respondents choose, in effect, to challenge the Policy on its face, we will not assume the worst. Accordingly, we [conclude] that the invasion of privacy was not significant."

515 U.S. at 660, 115 S.Ct. at 2394.

The Tecumseh Policy contains an express provision for confidentiality of prescription drug information. The Tecumseh Policy provides:

"The monitor shall give each student a form on which the student may list any medications legally prescribed for the student, he or she has taken in the preceding thirty (30) days. The parent or legal guardian shall be able to confirm the medication list submitted by their child during the twenty-four (24) hours following any drug test. The medication list shall be submitted to the lab in a sealed and confidential envelope and shall not be viewed by district employees."

Plaintiffs' Exhibit "O," p. 5. Thus, to the extent that the Tecumseh Policy provides for disclosure of prescription drug information at the time of testing, it expressly provides for the level of confidentiality of prescription drug information contemplated by the Supreme Court in *Vernonia*.

The Plaintiffs offer evidence that, in practice, the District has not always adhered to the strict confidentiality provi-

sions of the Policy. For example, the choir teacher testified on deposition that some students submitted lists of prescription drugs along with their consent forms, prior to the start of testing.[48] The choir teacher admitted that she read some of the lists, and that she placed them in a folder or envelope which she may have occasionally left, closed but unsealed, on a table in the choir room.[49] Admittedly this practice represents a departure from the strict confidentiality provisions of the Policy. However, the Plaintiffs have not shown that the choir teacher's actions resulted in any actual disclosure of private medical information to fellow students.[50] The Court also finds it significant that the choir teacher testified that because she travels with her students off school premises, her students have been supplying her with prescription drug and other medical information long before the Policy was implemented.[51]

The Plaintiffs also offer evidence that during the testing process, students handed their "forms" to the faculty monitor when they entered the restroom stall. However, it is not clear from the deposition testimony cited whether the "forms" referred to included prescription drug information or other information of a private nature. Nor does the evidence cited indicate whether the faculty monitors read the information contained on the forms, or whether students were allowed to place their forms in a sealed envelope. In the

---

**48.** Deposition of Carolyn Daugherty, Plaintiffs' Exhibit "A," p. 81. Ms. Daugherty testified that students were only required to turn in the first page of the consent form, and were not required to turn in the second page, consisting of a prescription drug list.

**49.** Deposition of Carolyn Daugherty, Plaintiffs' Exhibit "A," p. 82. Ms. Daugherty explained that she normally kept the folder or envelope in her office and closed the door, and that she tried to be very careful to safeguard it because it also contained money.

**50.** The Plaintiffs have not shown that either the choir teacher or anyone else read their prescription drug lists, or even that they submitted such lists. Nor have the Plaintiffs shown that any students whose lists the choir

teacher reviewed objected to this, or that the folder containing the forms was ever disturbed.

**51.** Ms. Daugherty testified that she has generated her own form for obtaining medical information she considers pertinent from her students. Ms. Daugherty's form requires students to divulge any prescription drugs they are using, their insurance information and the name of an emergency contact person. Ms. Daugherty has been collecting this information from her students throughout her 29 years of teaching for reasons unrelated to the drug testing policy. She carries these forms with her when traveling with students on overnight trips, and has had occasion to use the information in a hospital emergency room. (Defendants' Exhibit "H," pp. 90 – 94).

absence of any evidence of an actual breach of privacy, the Court will not assume the worst. Under the circumstances, the Court finds that the invasion of privacy was not significant. *Accord, Vernonia,* 515 U.S. at 660, 115 S.Ct. at 2394, *citing Skinner, supra.*

### D. *Effectiveness of the Policy.*

The next factor to consider in weighing the reasonableness of the Policy is its effectiveness to address the special governmental need in question. *See, e.g., 19 Solid Waste Mechanics v. City of Albuquerque,* 156 F.3d 1068, 1074 (10th Cir. 1998). Addressing the efficacy of drug testing as a response to the severe drug problem in *Vernonia,* the Court noted that: "it seems ... self-evident that a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs." The Defendants offer evidence that, like student athletes, the student members of the other competitive groups are held in high esteem by their peers, and tend to be regarded as leaders and role models. The Plaintiffs deny that they are student leaders or role models, and further assert that students participating in extracurricular activities are among the least likely to use drugs.

The Court need not resolve the dispute over whether members of the targeted group, i.e., students participating in competitive extracurricular activities, are regarded as role models. Nor will the Court speculate as to whether these students are more likely than others to abuse illegal drugs. The Supreme Court's holding in *Vernonia* does not require a school district to isolate those students most likely to use

drugs.[52] Although the Supreme Court cited evidence that the drug problem in that school was particularly acute among athletes, the Court did not suggest that a school drug testing policy should target those most likely to use drugs, or exclude those deemed least likely to use drugs.[53] It can scarcely be disputed that the drug problem among the student body is effectively addressed by making sure that the large number of students participating in competitive, extracurricular activities do not use drugs.

The Court rejects the Plaintiffs' contention that only suspicion-based drug testing would be reasonable within the meaning of the Fourth Amendment. The Supreme Court has repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment. *Vernonia,* 515 U.S. at 663, 115 S.Ct. at 2396; *Skinner,* 489 U.S. at 629, n. 9, 109 S.Ct. at 1420, n. 9. As the Supreme Court explained in *Vernonia,* the alternative of testing all students only upon suspicion is fraught with difficulties. "It may be impracticable, for one thing, simply because the parents who are willing to accept random drug testing [for students engaged in extracurricular activities] are not willing to accept accusatory drug testing for all students, which transforms the process into a badge of shame." 515 U.S. at 663, 115 S.Ct. at 2396. Suspicion-based drug testing brings the risk that teachers would impose testing arbitrarily upon troublesome but not drug-likely students. It generates the risk of defending lawsuits charging arbitrary imposition of drug testing, or that demand greater process before accusatory drug testing is imposed. It would also impose upon school teachers and coaches the new function of

**52.** Similarly, the drug testing regulation upheld in *Skinner* made no attempt to isolate those railroad employees most likely to use illegal drugs. Nor did the drug testing policy in *Von Raab* isolate those customs employees deemed most likely to use illegal drugs.

**53.** In this Court's view, any attempt to do either would raise serious concerns. A policy

attempting to draw such distinctions would be subject to challenge as arbitrary, and would unfairly brand some students as "drug-prone." Drug testing under a policy target at the drug prone would undoubtedly carry a social stigma and inherent indignity unknown to students tested under a policy of random testing of those participating in certain extracurricular activities.

spotting drug users, which is not readily compatible with their vocation. *Id.*

### III. *Conclusion.*

Upon careful consideration of the evidence presented by both sides, the Court concludes that the Defendants have adequately demonstrated a special need to justify the warrantless, suspicionless drug testing at issue here. The Court finds that the privacy interest asserted is diminished by virtue of the Plaintiffs' position as children in a public school testing, and that the intrusion is minimal. The Court further finds that the policy is effective to address the special governmental need asserted. Accordingly, the Court concludes that the drug testing policy constitutes a reasonable search, permissible under the Fourth Amendment.

The Defendants' Motion for Summary Judgment is hereby GRANTED. The Plaintiffs' Motion for Summary Judgment is hereby DENIED.